Filed 9/16/21  Ross v. Fox CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JERRY ROSS et al., | B298873 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC576879) |
| v. | |
| ALAN FOX et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Appellants. | |
| | NO CHANGE IN THE APPELLATE JUDGMENT |

THE COURT:

The above-entitled opinion filed on August 25, 2021 is modified as follows:

On page 34, after the first paragraph, add the following paragraph:

The Fox defendants contend on appeal that "no reasonable jury could reject the financial elder abuse claim on the ground that Ross was not an elder." But the Fox defendants' attorney emphasized in his closing argument that Jerry had not proved the elements of elder abuse as set forth in the jury instructions, starting with the requirement that Jerry be at least 65 at the time of the fraud. The attorney argued, "When you look at the jury instructions, there are a few that set forth elements, and what they set forth is . . . what the plaintiffs need to prove. And they have to prove each and every one. For instance, with this financial elder abuse [claim], couple things to keep in mind. Prior to 2007, I believe it is, Mr. Ross wasn't 65." The Fox defendants could have argued only that Jerry failed to prove his fraud claim, and thus the elder abuse claim failed as well. But their attorney elected to highlight that Jerry was not 65 prior to 2007 (or more correctly prior to 2006), which the jury could have understood to mean the fact the first two investments were made prior to when Jerry turned 65 caused the elder abuse claim to fail.

On page 34, in the first sentence of the third paragraph, add the word "therefore" between the words "could" and "reasonably" so the sentence reads:

> The jury could therefore reasonably (but erroneously) have concluded the fraudulent conduct occurred before Jerry turned 65, even though the fraud continued after Jerry turned 65 because the Fox defendants continued to take Jerry's investment money until 2012.

Appellants' petition for rehearing is denied.
There is no change in the appellate judgment.


_____
PERLUSS, P. J.          SEGAL, J.                FEUER, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JERRY ROSS et al., | B298873 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC576879) |
| v. | |
| ALAN FOX et al., | |
| Defendants and Appellants. | |

APPEALS from an order and judgment of the Superior Court of Los Angeles County, Michelle Williams Court, Judge. Affirmed in part; reversed in part with directions.

Leonard, Dicker & Schreiber, Richard C. Leonard and Steven A. Schuman for Plaintiffs and Appellants.

Munger, Tolles & Olson, Mark R. Yohalem and Maggie H. Thompson for Defendants and Appellants.

_____

Jerry Ross and his children Eric Ross and Jenny Zipkin (collectively, the Rosses) appeal from an order granting the motion for a new trial filed by Alan C. Fox and ACF Property Management, Inc. (collectively, the Fox defendants) and denying Jerry's motion for judgment notwithstanding the verdict on his claim for financial elder abuse.[1] The Rosses, who invested more than $4.7 million in 13 commercial real estate investment companies syndicated by the Fox defendants over a 14-year period, filed this action for breach of fiduciary duty, fraud, securities fraud, and financial elder abuse (of Jerry), alleging the Fox defendants made misrepresentations in the investment offering materials to conceal their taking of millions of dollars of profits, fees, and commissions. The jury returned a verdict for the Rosses on fraud, securities fraud, and breach of fiduciary duty and for the Fox defendants on financial elder abuse. The jury awarded more than $12.3 million to the Rosses, including $8 million in punitive damages. The trial court also awarded over $800,000 for rescission. On appeal, the Rosses contend the trial court erred in granting the Fox defendants' new trial motion based on an inconsistent verdict (finding the Fox defendants liable for fraud and related claims, but not financial elder abuse), instead of entering judgment in Jerry's favor for financial elder abuse.

The Fox defendants filed a protective cross-appeal from the judgment, in which they contend the trial court abused its discretion in allowing a key witness the Rosses concealed during discovery to testify and in allowing improper expert testimony.

---

[1] We refer to the Jerry and Eric Ross by their first names to avoid confusion.

The Fox defendants also argue instructional error and the trial court's approval of erroneous verdict forms proposed by the Rosses.  Further, they challenge the consequential and punitive damages awards and the trial court's award of prejudgment interest.

We reverse the trial court's order granting a new trial and affirm the court's order denying the Rosses' motion for judgment notwithstanding the verdict.  We also reverse the punitive damages award against ACF.  We otherwise affirm.  We remand to the trial court with instructions to enter judgment in favor of the Rosses, but to strike the punitive damages award against ACF.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Rosses' Investments with the Fox Defendants*
Jerry is a retired television writer who began investing in real estate, including three small apartment buildings, in the late 1990s.  Jerry was born in August 1941.  Jerry's son Eric also invested in apartment buildings and helped manage his father's properties.  Jerry's daughter Zipkin is a pediatrician.

Fox trained as a lawyer and is the principal and founder of ACF, which he incorporated in 1968.  The Fox defendants are primarily engaged in syndicating commercial real estate, particularly suburban shopping centers.  As part of their syndication business, the Fox defendants identify investment opportunities, conduct due diligence and negotiate terms for the acquisition and debt financing of a shopping center, and then set up a limited liability company (LLC) or series of LLC's to take title to each shopping center that is acquired.  The Fox

3

defendants sell shares in the LLC's to accredited investors[2] before, during, or after the property acquisition. ACF serves as the managing member of each LLC and usually acts as the manager of the underlying property. Investors in ACF's syndications receive ordinary distributions from shopping center operations through the LLC and larger special distributions when a shopping center is sold or refinanced. Syndication allows investors to benefit from the income, appreciation, and tax advantages of owning a large commercial property that would be unavailable to them if they invested individually.

Jerry and Fox first met in approximately July 2004, when Jerry was considering selling three apartment buildings in which he had about $4 million in equity and investing the proceeds with ACF in shopping centers. Jerry sent an email to Fox explaining as to the $4 million, "It's most of my kids' inheritance, with some left over for some charities. What I ask is that you not put me into anything you wouldn't put your own children into, and that we spread the risk around." Fox suggested a few different shopping centers that ACF was in various stages of syndicating. After further discussions and an in-person meeting, Jerry purchased for Eric and Zipkin a $150,000 interest in the LLC that acquired the Provinces shopping center in Chandler, Arizona. Eric and Zipkin were not materially involved in the transaction; rather, Jerry communicated directly with Fox and provided the investment money. On May 19, 2005 Jerry made

---

[2] An accredited investor is an individual who has a net worth exceeding $1 million and an income of at least $200,000 in each of the previous two years (or a married couple with $300,000 in combined income) and an expectation to receive the same income in the current year.

his first personal investment with ACF when he purchased a $900,000 interest in the LLC that acquired the Highlands Ranch shopping center in Denver, Colorado. Jerry was 63 at the time.

Between 2004 and 2012 the Rosses cumulatively invested approximately $4.7 million in 13 ACF syndications.[3] Provinces and Highlands Ranch were the only syndications in which the Rosses invested before Jerry turned 65 in August 2006. Jerry received all documents from the Fox defendants related to Eric's and Zipkin's investments and directed Eric's and Zipkin's investment decisions. Zipkin testified she did "not really" read the investment documents she signed and instead relied on her father's advice. Eric read the documents and discussed the investments with Jerry, but ultimately Eric "pretty much" accepted Jerry's decisions.

Before the Rosses invested in each syndication, the Fox defendants provided them two documents related to the offering: a single-page executive summary and a single-page table of financial projections (the offering documents).

---

[3] We have rounded the amounts of the investments and returns. Jerry invested $2.8 million in 11 syndications: Highlands Ranch, North Oak, Knox Street Promenade, Pipeline Plaza, Writer Square, Market at Southpark, Bell Creek, Loggins Corners, Tower Plaza, Trophy Club, and Laveen Ranch. Eric invested $1 million in six syndications: Provinces, Deer Creek, North Oak, Knox Street Promenade, Writer Square, and Loggins Corners. Zipkin invested $950,000 in five syndications: Provinces, Deer Creek, North Oak, Knox Street Promenade, and Loggins Corners. Eric's and Zipkin's interests in Loggins Corners ($125,000 each) were given to them by Fox after the Knox Street Promenade property was placed into receivership; the lender later foreclosed on the property.

The executive summary for each offering included entries for: "Location," "Price," "Property Description," "Area Description," "Demographics," "Year Built," "Projected Annual Net Operating Income," "Cash Required," "Projected Return," and "Minimum Investment." The financial projections included the monthly gross income and expenses of the shopping center projected over a five-year period and the projected return on the investment. The projections were based on assumptions as to the "Net Investment," which was the sum of the "Purchase Price," "Loan and Closing Costs," and "Operating Reserves," less "Loans Payable." For all of the Rosses' investments, the "Price" listed on the executive summary was identical to the "Purchase Price" in the financial projections, and the "Cash Required" in the executive summary was identical to the "Net Investment" in the financial projections.

As of June 30, 2018 the Rosses had received nearly $3.7 million in distributions from their cumulative investment of $4.7 million over the prior 14 years. They still held interests in six syndications that generated an additional $207,000 between July 1, 2018 and March 13, 2019.

B.     *The Complaint*
The Rosses filed this action on March 26, 2015. The operative first amended complaint asserted causes of action against the Fox defendants for breach of fiduciary duty, fraud, securities fraud, financial elder abuse as to Jerry (elder abuse), and an accounting.[4] The complaint alleged the Fox defendants

---

[4]     The operative complaint named 36 defendants, including the Fox defendants, several ACF executives, real estate brokers

6

made numerous intentional misrepresentations in the executive summary and financial projections for each syndication and in other oral and written communications with the Rosses, including statements about (a) purchase prices; (b) projected expenses, including closing costs; (c) actual performance of the investments; (d) the reasons for the investments' performance; (e) the reasons "[d]efendants were recommending the purchase and sale of various properties (i.e., [d]efendants . . . were only interested in creating more transactions so that they could take more illegal fees and commissions)"; (f) the costs and benefits of refinancing; and (g) defendants' earnings from the investments.

The Rosses alleged the misrepresentations were part of a scheme among the Fox defendants and associated brokers to mislead investors about the cost of the properties acquired in each syndication and then to "pay themselves a series of commissions and fees that approximately make up the difference between the stated purchase price and the actual purchase price. Some of the fees were charged as closing costs in connection with the purchase; some fees were charged during the ownership of the property, usually during refinancing; and some fees were charged in connection with the sale of the properties." The complaint included detailed allegations as to syndications for Writer Square, the Market at Southpark, Loggins Corners, Tower Plaza, and Knox Street Promenade shopping centers and alleged on information and belief that the Fox defendants engaged in the "same or similar conduct" with respect to all of the syndications in which the Rosses invested.

alleged to have collaborated with the Fox defendants, and the LLC's in which the Rosses invested. The Rosses dismissed all defendants other than the Fox defendants prior to trial.

On July 17, 2017 the Rosses filed an amendment to their prayer for relief to include a prayer for rescission and the return of the money they invested, less any distributions, plus "consequential damages in an amount representing a fair and reasonable rate of return on the investments from the time the investments were made." The Rosses also sought punitive damages and attorneys' fees.

C.  *The Trial*

A jury trial was held between May 29 and July 3, 2018, with the trial bifurcated into liability and punitive damages phases. Jerry, Eric, Zipkin, Fox, and ACF's chief operating officer Eric Diamond testified, and excerpts of the deposition testimony of ACF's former chief financial officer Edward Delava were read to the jury. The Rosses also called Carl Albert, a third party who invested in several ACF syndications between 2002 and 2010. Paul Habibi, a syndicator and college lecturer, testified as the Rosses' expert on damages. Three experts testified for the Fox defendants: Maryellen Sebold, a forensic accountant, analyzed the Rosses' investments and distributions; Alan Herd, a syndicator and consultant, testified about custom and practice in the syndication industry; and Andrew Minstein, a property appraiser, testified as a rebuttal witness with respect to Habibi's damages analysis.

1.  *The liability phase evidence*
    a.  *The offering documents and settlement statements*

Potential investors who inquired about investing in ACF syndications were provided only the executive summary and

8

financial projections for the syndication and photographs of the property. The escrow agent issued to the LLC, upon the closing of the sale of each property, a buyer statement of settlement (settlement statement).[5] The settlement statements included the price the LLC paid to purchase the property, as well as the closing costs and credits, acquisition fees, and commissions. Prior to the litigation the Rosses did not receive any settlement statements for the underlying properties in connection with their investments.

The settlement statements showed that for each of the 13 syndications in which the Rosses invested, the purchase price reflected in the offering documents was greater (often significantly greater) than the LLC's purchase price for the underlying property. For example, the purchase price for the Writer Square syndication was $64 million in the offering documents, but the LLC purchased the property for $58.4 million (a difference of $5.6 million). The difference between the purchase price and the price paid for the Market at Southpark in Littleton, Colorado was $2.8 million. The difference for the Knox Street Promenade in Dallas, Texas was more than $2.2 million. The difference for Highlands Ranch, Jerry's first investment, was just above $1 million. Ten of the 13 syndications reflected a difference of more than $1 million.

The settlement statements also showed that for nine of the syndications, the LLC's paid ACF a commission or acquisition fee on the purchase, ranging from a $1.2 million "consulting fee" paid

---

[5] The offering documents for each of the 13 syndications in which the Rosses invested were admitted at trial as well as the settlement statements for 12 of the 13 syndications (a settlement statement for Provinces appears to have been omitted).

9

to ACF in connection with Writer Square to $50,993 in "commissions to ACF" paid upon the purchase of Laveen Ranch Marketplace in Phoenix, Arizona.  In some instances where the LLC's later sold the property, the settlement statements reflected commissions to ACF on that sale as well, including a $553,000 commission for sale of Highlands Ranch in 2011 and a $1.4 million commission for sale of Writer Square in 2013.

> b.    *Jerry's testimony*

Jerry testified that at the time he invested in each ACF syndication, he believed the purchase price set forth in the offering documents was the price the LLC's paid to acquire the underlying properties.[6]  Jerry did not know that ACF was collecting commissions or acquisition fees on the transactions, and they were not disclosed to him.  Jerry believed the "[c]ash [r]equired" in the executive summary (which in all cases was identical to the "[n]et [i]nvestment" in the financial projections) reflected the amount of money the LLC investors collectively needed to put up to purchase the underlying shopping center.  His understanding was that this net investment reflected the down payment paid to the seller plus loan and closing costs and the operating reserve, as set forth in the financial projections.

Jerry reviewed the executive summary and financial projections for Writer Square.  The executive summary and financial projections for the project listed a purchase price of $64

---

[6]    Eric also testified he assumed the prices listed in the offering documents reflected the price the LLC paid for the underlying property.  Zipkin testified she did not read the offering documents, relying on Jerry to make her investment decisions.

10

million, with cash required (shown as a net investment) of $23.3 million. The financial projections page calculated the $23.3 million net investment by adding to the $64 million purchase price the loan and closing costs of $750,000 and the $3 million operating reserve, then subtracting the "interest only" loan of $44.45 million.

Jerry would not have invested any money with ACF if he had known the purchase price on the offering documents was not the actual price of the syndicated property. In his view, the inflated purchase price meant his investment in each syndication was already "in the hole" when he invested; that is, even if the underlying property appreciated at the rates projected in the offering documents, Jerry's effective rate of return was less because he acquired a beneficial interest in the property at a substantially higher price. Further, had Jerry known his required cash investment exceeded the true pro rata cost for acquiring each property, he would have investigated where the excess money was going and learned of the excessive and arbitrary commissions and fees ACF was collecting. He added, "All of the investors' profit could possibly have disappeared into the fees that [Fox] was taking. And he would benefit and the other investors wouldn't." By contrast, in his initial phone conversation with Fox in 2004, Jerry asked Fox "What do you get out of it[?]" and "[Fox] said, a management fee of approximately 4 percent. He also said he invests in the properties the same way the investors do, and he makes his money the same way the investors do, by investing in the properties or many of the

11

properties . . . ."[7]  Investor communications from ACF reinforced that the benefit to Fox would come from appreciation in the value of the shopping centers.  For example, an investor letter sent to Eric and Zipkin (care of Jerry) in January 2005 stated, "If we do nothing but buy at the low end of the range and sell at the high end, we'll enjoy an excellent return on our investment."

During cross-examination, Jerry was shown the executive summary for Highlands Ranch, the first syndication he invested in, which stated, "Because this property is being offered at virtually the acquisition cost, investors will receive . . . a cash return of 11% per year."  The financial projections likewise stated, "[T]his property is available virtually at cost, after investors receive a cumulative noncompounded preferred cash return of 11%.  The balance of cash available upon refinance or sale will be divided equally between investors and Alan C. Fox."  Asked whether these representations, including the word "virtually" alerted Jerry that the purchase price of the LLC was not the same as the cost of the property, Jerry testified he thought it meant "we were getting [the property] at less than the acquisition cost."  Jerry testified he noticed the "virtually at cost" language had not been included in the offering documents for the earlier Provinces syndication in which he had invested, and he assumed it meant the investors were actually going to receive Highlands Ranch at a discount from its purchase price and Fox

---

[7]  The LLC purchase agreements the Rosses executed for each investment included a representation that the "[b]uyer has made its own independent investigation as to the nature of this investment and has not relied upon oral representations of the [s]eller, [m]anager, or other buyers in determining whether to invest."

"was going to make it up at the back-end when it was sold." However, Jerry did not ask Fox about the language, nor did he ever ask Fox, "Are we getting this property at exactly your acquisition price?"

Jerry was also shown a 2007 email from Fox regarding the syndication for North Oak Marketplace in Kansas City, Missouri. Fox stated Jerry would be "exchanging into North Oak Marketplace 07 B, LLC for $500,400 which purchases 10.535% of the building. I am selling this to you at approximately my cost, and [my wife] and I will own the balance of the property." Jerry testified that in light of the language in the offering materials he was provided for Highlands Ranch he believed Fox meant by "approximately my cost" that Jerry would receive an interest at a discount.

### c. *Fox's testimony*

Fox admitted during his testimony that for all 13 syndications in which the Rosses invested, the purchase price in the LLC offering documents was different than the price paid for the underlying property. However, Fox testified this was appropriate because the investors were buying an interest in the syndication LLC's, not the underlying property.[8]

According to Fox, the purchase price in the offering documents referred to the value at which ACF "transferred the

---

[8] The operating agreements for the LLC's stated, "No [m]ember shall have any ownership interest in the property of the [LLC]." The purchase agreements executed by the Rosses for each investment stated the investor was buying a membership interest in the LLC and a "beneficial interest in and to the [p]roperty."

property to the LLC's," not the purchase price of the shopping center.[9]  However, during examination by the Rosses' attorney, Fox acknowledged as to Writer Square that the offering documents referred to the executive summary for Writer Square (the shopping center, not the LLC), and the listed purchase price of $64 million was for the shopping center, not the LLC.  The additional information on the executive summary, including the "Location," "Property Description," "Area Description," "Demographics," "Year Built," "Projected Annual Net Operating Income," and "Projected Return" all referred to the shopping center, not the LLC.  Further, Fox agreed that the LLC's operating income is the same as the shopping center, and the LLC did not own anything other than the shopping center and any money it had in its bank account.  When asked whether it was "true that the . . . purchase price is the price at which the LLC or if there's more than one, the LLCs, paid to acquire 100 percent of the Writer Square property at the time of the executive summary," Fox answered, "Yes."  Further, when asked whether "the price paid to the seller to buy Writer Square was $58,400,000," Fox responded, "That was paid to the seller, yes."

Fox explained the LLC's were the investment product being sold by the Fox defendants, akin to a coffee shop selling coffee, whereas the price for the acquisition of a shopping center was a cost of business, and a markup was appropriate as in any

---

[9]     The properties were not actually sold or transferred from ACF to the syndication LLC's.  The settlement statements reflect that each LLC generally took title to the property from its previous owner.  However, Fox testified that at the time an LLC acquired a property, investor funds were not necessarily available, and Fox used his own funds to close escrow.

14

business to compensate the Fox defendants for their efforts and expenses in identifying and analyzing opportunities, preparing the syndication, fronting costs, and assuming substantial risk at the time of acquisition. Fox never represented in the offering documents that the purchase price was the price for acquiring the underlying property. However, Fox also never told investors the purchase price included costs in addition to the price at which an LLC acquired the underlying property. Asked if it was true "there were perhaps five people who asked you information about the price of the property over the years that you were syndicating, and you refused to tell them the price?" Fox answered, "Yes, I believe that's correct." Fox admitted he may have told his staff not to answer the question, "What is the price of the property?" Fox also admitted that none of the acquisition fees and commissions taken by ACF was disclosed to investors.[10]

### d.	*The Bell Creek Commons acquisition*

One significant issue at trial was Jerry's investment in the syndication of the Bell Creek Commons shopping center in Mechanicsville, Virginia (Bell Creek). In April 2010 ACF, acting through broker Gary Dragul, entered escrow for the acquisition of the property for $11.1 million. The offering documents, which were sent to Jerry in June 2010, stated a purchase price of $12.5

---

[10]	With respect to the acquisition of Writer Square, Fox admitted ACF had no agreement with the LLC to earn a fee in connection with the transaction, and he personally determined the LLC should pay ACF a $1.2 million fee at closing based on the "complexity of the transaction, the quality of the transaction, the length of time it took, the level of expertise," and his guaranteeing a $44.5 million loan.

million.  On June 22 Jerry emailed Fox, "I see online that the place was listed for sale at $11,250,000.  How come our purchase price is 12.5?"  On June 26 Fox responded, "I have no idea when the $11,250,000.00 price was posted, or even if it was ever official.  Sometimes a broker will know that a property is available, then post his or her own 'listing' at a price which was never even discussed with the owner.  [¶]  I have attached the offering package which I received for Bell Creek Commons.  As you can see, the asking price is $13,250,000.00.  The price to my investors is $12,500,000.00 . . . .  Since there is a lot of money in hedge funds chasing relatively few outstanding shopping centers, prices have increased about 10% during the past six months.  Several buyers would now pay a 7.25 [capitalization rate] on this property, which is a price of $13,543,145.00—about 8.35% more than you are paying.  I am under a confidentiality agreement on the offering package, so PLEASE KEEP THIS CONFIDENTIAL.  It is vital to my ability to buy well that the listing brokers . . . trust me to keep their information entirely confidential."  Fox sent Jerry the seller's offering document that advertised a listing price of $13.3 million.  Jerry proceeded to invest $500,000 in the syndication in August 2010.

After Jerry invested in Bell Creek and the purchase of the shopping center closed, Fox learned the listing broker was advertising that the property had been sold for $11.1 million.  Fox forwarded the broker's advertisement to Dragul and wrote, "This has caused serious problems to me with investors.  Please make sure this NEVER happens again."  Dragul responded, "We'll put it in the contract so they are precluded from advertising."  Fox testified he told Dragul that investors were upset in order to command Dragul's attention, and Fox's true

16

concern with brokers advertising prices was to avoid publicity: "It was to keep this total thing private. I've never advertised for investors. I don't like advertising. Investors can—anybody can look up what the price of anything is."

2. *Expert testimony on damages*

The Rosses' expert Habibi testified that in his experience as a syndicator he believed he had a duty to give investors all facts necessary for the investor to make a well-informed investment decision, including how the deal would be structured and how profits, losses, and cash flows would be divided. He opined that, "as long as fees are generally disclosed and mutually agreed to by the parties, I would consider them to be above board and proper. So I guess that's another way of saying that a syndicator or sponsor can generally charge whatever they want as long as everyone has an understanding as to what that is and everyone has agreed to it." Habibi's own practice was to furnish investors with a table identifying both where investor money is coming from and the costs and income of the investment, and generally to furnish settlement statements for property acquisitions.

Habibi testified he understood the Rosses were seeking rescission of their investments, and that rescission was a "legal term," but his understanding was "it's effectively undoing the investment and making it such as if the Rosses had never made those investments to begin with and instead had put those monies elsewhere or in some alternate scenario." Given a hypothetical based on the facts of this case, Habibi was asked, "What would the Rosses have to do to rescind these transactions?" Habibi responded rescission would be a two-part process: "The first part would be the Rosses give back their

interest in those entities.  And then the second portion of it would be calculating the accumulation of funds at a certain growth rate of monies, the net monies that were invested still in the deals themselves.  [¶]  You mentioned [$]4.7 million went in and about [$]3.6 went out, so currently there's about [$]1.1 million capital to stop and return.  So that portion of the money is due to the Rosses.  But also, throughout the course of the 14 years the net investment that was in the deals to begin with would be growing at a specific growth rate."

Tracking when each dollar went into the investments and when each dollar was paid out, Habibi projected a growth rate of the Rosses' funds had they been invested elsewhere using three different measures for rate of return.  First, Habibi assumed the Rosses continued to invest in apartment buildings instead of investing with the Fox defendants and applied an index of monthly investor returns paid by real estate investment trusts that hold apartment holdings published by the National Association of Real Estate Investment Trusts (NAREIT), and opined the Rosses would have seen a return of  $4.4 million on their investment money between 2004 and the time of trial.  Second, Habibi calculated an average annual rate of return of 15.1 percent, which he based on a combination of the projections set forth in the Fox defendants' offering documents for the Rosses' investments.[11]  Applying this rate as a constant return across the investment period, Habibi estimated the Rosses would have achieved a return of nearly $9.9 million.  Third, Habibi

---

[11]     Habibi's calculation of the average rate of return was based on only nine of the Rosses' 13 investments, because the offering documents for only those nine provided both a projection of cash flows and a return from appreciation of the properties.

applied a constant rate of return of 22 percent based on a projection given in a letter ACF sent to its investors in April 2003.  Based on this projection, Habibi calculated a return of about $22.1 million.

Minstein testified in rebuttal that Habibi's second and third estimates should be given no weight because they were based on a constant rate of return, whereas returns on real estate investments fluctuated dramatically over the 14-year period of the analysis, and the amounts the Rosses had invested with ACF at any one time varied.  Moreover, the second rate of return (15.1 percent) was based on an arbitrary and incomplete selection of the offering documents that overstated the average of ACF's projections,[12] and the third rate of return (22 percent) was based solely on one projection made in 2003 that was never transmitted to the Rosses, was given 17 to 18 months before their first investment, and did not relate to the portfolio of syndications in which the Rosses invested.

With respect to Habibi's lowest estimate, Minstein opined that Habibi's use of the NAREIT apartment index was not the appropriate measure of return "because the Rosses invested in 13 separate investments over an [eight-year] term and all of the investments were in shopping centers."  Minstein opined that data about the rate of returns paid by private investment companies with shopping center holdings existed and would be the best indicator of an appropriate rate of return.  However, Minstein did not offer an opinion as to the rate of return, and he

---

[12]     Minstein testified that when he tried to calculate the average rate of return based on the projections in the offering documents, he calculated a rate of 12.6 percent.

19

did not offer an opinion as to how much the Rosses were damaged or how to measure damages in connection with rescission.[13]

3. *The jury instruction on elder abuse*[14]

The trial court instructed the jury with a slightly modified version of CACI No. 3100 on elder abuse proposed by the Fox defendants as follows: "Plaintiff Jerry Ross claims that defendants violated the Elder Abuse and Dependent Adult Civil Protection Act by taking financial advantage of him. [¶] To establish this claim, Jerry Ross must prove that all of the following are more likely to be true than not true. [¶] One, that defendants took Mr. Ross's investment [monies]; [¶] two, that Jerry Ross was 65 years of age or older at the time of defendants'

---

[13] Herd, the Fox defendants' expert on syndication industry custom and practice, testified that investing in a syndication is a "strictly different kind" of investment than buying real property, and "you very rarely see [a property's acquisition cost] on the prospectus when you're buying a syndication because it's . . . not relevant to the person that's buying it."

Sebold testified as to her analysis of the Rosses' payments into and distributions received from the syndications between 2004 and 2014. Habibi testified his analysis yielded virtually the same data as Sebold's, but "[j]ust so we're all on the same page, I literally took my numbers and made adjustments so they were dollar for dollar the exact same as hers." Neither party has raised any issues regarding the testimony of Herd and Sebold on appeal.

[14] The Fox defendants contend the court erred in instructing the jury with respect to fraud, fiduciary duty, bad faith, and consequential damages. We discuss the instructions relevant to those contentions in our discussion of the cross-appeal below.

20

conduct; [¶] . . . three, that defendants took Mr. Ross's investment monies with the intent to defraud him; [¶] four, that Jerry Ross was harmed; and [¶] five, that the defendants' conduct was a substantial factor in causing his harm."

The Rosses proposed a more detailed instruction that stated with respect to the second element: "Jerry Ross was 65 years old on August 16, 2006. At the time he invested in the following investments he was 65 years old and under California law he is considered an elder: Knox St. Promenade, North Oak, Pipeline, Writer Square, Bell Creek, Market at Southpark, Loggins Corner, Tower Plaza, Trophy Club, and Laveen Ranch."

At the hearing on the jury instructions, the trial court indicated it was inclined to give the Fox defendants' version because "it inserts the names and the age [into CACI No. 3100] but doesn't talk specifically about the facts of this case." The Rosses' counsel objected that the Fox defendants were "inviting error . . . because some of the investments, or at least a couple of them, were before [Jerry] was 65. They take that out, it's up to them." The Fox defendants' counsel asked the "CACI be given as it reads."

### 4. *The jury verdict on liability*

On July 2, 2018 the jury returned a verdict for the Rosses on fraud, securities fraud, and breach of fiduciary duty and for the Fox defendants on elder abuse. The verdict form contained 35 questions, divided into six sections. Section one (questions 1-8) related to Jerry's causes of action and asked the jury to select in favor of Jerry or the defendant on (1) Jerry's claim against Fox for breach of fiduciary duty; (2) Jerry's claim against ACF for breach of fiduciary duty; (3) Jerry's claim against Fox for fraud;

21

(4) Jerry's claim against ACF for securities fraud; (5) Jerry's claim against Fox for securities fraud; (6) Jerry's claim against ACF for securities fraud; (7) Jerry's claim against Fox for elder abuse; and (8) Jerry's claim against ACF for elder abuse. The jury held in favor of Jerry on questions 1-6 and in favor of the Fox defendants on questions 7-8. Sections two and three of the verdict form (questions 9-20) contained analogous questions for Eric and Zipkin (without questions as to elder abuse).

Section four (questions 21-25) stated, "Complete this section only if you find in favor of Jerry Ross on at least one of his claims." Question 21 stated, "We award Jerry Ross rescission," and the jury selected "yes." Question 22 stated, "We award Jerry Ross the following amount of damages," and the jury entered $2,521,938.51. Question 23 asked the jury to assign a percentage of responsibility for damages to Fox and ACF, and the jury entered 100% for each defendant. Question 24, under the subheading "Punitive Damages," asked the jury, "Did Alan C. Fox engage in the conduct with malice, oppression or fraud?" The jury selected "yes." Question 25 asked the same question as to ACF, and the jury again selected "yes." Sections five and six of the verdict form (questions 26-35) stated the same damages questions for Eric and Zipkin, and the jury selected the same answers as they did for Jerry, except that the jury awarded Eric damages of $925,708.42 and Zipkin damages of $869,740.59.

5. *Punitive damages phase*

On the afternoon of July 2, 2018 trial commenced on punitive damages. The Rosses introduced one additional trial exhibit concerning Fox's net worth, and trial counsel presented closing arguments. The exhibit was a 15-page document

produced by Fox in response to the court's order authorizing the Rosses to take punitive damages discovery pursuant to Civil Code section 3295. The document included a "Summary of Equity and Pro-Forma Cash Flow as of December 31, 2016" signed by Fox, dated February 17, 2017 (financial statement). As described by the Rosses' attorney during closing argument, the document indicated that Fox had a net worth in excess of $250 million at the end of 2016, his annual salary from ACF was $1.5 million, and he received $875,000 in monthly income from his properties' operations.[15]

On July 3, 2018 the jury awarded punitive damages against Fox in the amounts of $2.4 million to Jerry, $800,000 to Eric, and $800,000 to Zipkin. The jury entered punitive damage awards in the same amounts against ACF.

D.      *Statement of Decision on Rescission and Fees*

Following the receipt of the jury verdicts, the Rosses filed a proposed judgment, a motion for an award of attorneys' fees pursuant to Code of Civil Procedure section 2033.420,[16] a motion for expert witness fees pursuant to section 998, and a memorandum in support of including postverdict interest in the judgment. The Fox defendants objected to the proposed judgment and filed a motion pursuant to California Rules of

---

[15]     We granted the Fox defendants' motion to file this exhibit under seal. However, counsel's statements in open court regarding Fox's net worth and income reflected in the exhibit were included in the Reporter's Transcript and are not confidential.

[16]     All further undesignated statutory references are to the Code of Civil Procedure.

Court, rule 3.1590(k) for a hearing on the judgment prior to the trial court's award of rescission, arguing the jury's damages award already included the value of the return of the Rosses' investment, and therefore the Rosses were not entitled to any further rescissionary amount.

After a hearing, further briefing, and argument, on March 7, 2019 the trial court issued its final statement of decision. The court determined the Rosses were entitled to "rescission damages" in the amount of the Rosses' total investment less distributions paid to them; statutory interest on the jury's award of consequential damages from the date of the verdict; attorneys' fees pursuant to section 2033.420 (for 25 percent of the time spent by Rosses' attorneys after September 11, 2017 attributable to ACF's unreasonable denial of requests for admissions); and expert witness fees pursuant to section 998.

On April 26, 2019 the trial court entered judgment on the jury's verdict. With respect to rescission, the court ordered the Rosses to return their remaining LLC interests, for the Fox defendants to pay the Rosses $1,075,679 (the Rosses' total investment of $4,744,381 less distributions through June 30, 2018 of $3,668,702) less a credit of $207,327 for distributions received from the Fox defendants on the remaining LLC's after July 1, 2018 but before judgment. Jerry, Eric, and Zipkin were awarded as compensatory damages $2,521,939, $925,708, and $869,741, respectively, plus 7 percent annual postverdict interest through the date of the judgment; $8 million in punitive damages ($4 million from Fox and $4 million from ACF); $241,857 in attorneys' fees; and $146,206 in expert fees.

24

E.	*The Rosses' Motion for Judgment Notwithstanding the Verdict and the Fox Defendants' Motion for a New Trial*

On May 13, 2019 Jerry filed a motion for JNOV on financial elder abuse, arguing that the jury verdict on fraud, breach of fiduciary duty, and securities fraud, and the jury's finding the Fox defendants engaged in conduct with malice, oppression, or fraud compelled a verdict in his favor on elder abuse because he was 65 years old at the time of most of the Fox defendants' conduct. On the same day, the Fox defendants filed a notice of intent to move for a new trial pursuant to section 657, subdivisions (1) and (3) through (7). In their motion, the Fox defendants asserted the jury's verdict on the fraud-related claims and on elder abuse were inconsistent and against the law. (§657, subd. (6).)[17]

After a hearing, on June 24, 2019 the trial court denied Jerry's JNOV motion and granted a new trial on all claims as to all parties. In its two-page ruling, the court held, "[I]t is undisputed that Jerry Ross invested with Defendants while he was 65 or older. That being the case, the jury's verdict on Jerry Ross's elder abuse cause of action is inconsistent with its verdicts on the causes of action for breach of fiduciary duty, fraud and securities fraud. The remedy for 'inconsistent verdicts is not to grant judgment as a matter of law in favor of one of the parties, but rather, to order a new trial.'"

The trial court ordered a retrial as to all the Rosses, finding a partial retrial would be prejudicial to the Fox defendants because Eric and Zipkin's claims "rely heavily on the interactions

_____

[17]	The Fox defendants asserted multiple other grounds for a new trial, which are similar to the grounds for their appeal from the judgment.

between Jerry Ross and [d]efendants, and their clams are substantially intertwined with those of Jerry Ross, both factually and legally."  The court did not address the Fox defendants' other arguments for a new trial.

The Rosses timely appealed from the order for a new trial. The Fox defendants filed a protective cross-appeal from the April 26, 2019 judgment.

## DISCUSSION

A. *The Rosses' Appeal*

    1. *The trial court abused its discretion in granting the motion for a new trial*

        a. *Governing law on inconsistent verdicts*

"Inconsistent verdicts are '"against the law,"' and the proper remedy is a new trial."  (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344 (*Shaw*) [new trial required where general verdicts were inconsistent]; accord, *Kurtin v. Elieff* (2013) 215 Cal.App.4th 455, 481.)  "Where the jury's findings are so inconsistent that they are incapable of being reconciled and it is impossible to tell how a material issue is determined, the decision is 'against law' within the meaning of Code of Civil Procedure section 657."  (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716; see § 657, subd. (6) [new trial may be ordered where "the verdict, or other decision is against law"].)  "'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence . . . .' [Citations.]  An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict

26

[citation] or irreconcilable findings." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 (*City of San Diego*).)[18] Where a verdict is inconsistent, one party is "no more entitled than [the other] to have the favorable verdict credited and the unfavorable one disregarded." (*Shaw*, at p. 1346; accord, *Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 375; see *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 967, 973 [inconsistent general verdicts required reversal of judgment because they were "against the law"].)

However, in analyzing a verdict to determine if it is inconsistent or otherwise defective, "'[a] verdict should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.'" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 877 (*OCM*) [upholding two general verdicts]; accord, *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424-425 [reconciling jury's special verdict finding that employer failed to engage in interactive process regarding plaintiff's disability with jury's finding the employer was not liable for failing to provide a

---

[18] Although *City of San Diego, supra,* 126 Cal.App.4th at page 676 involved a special verdict, in referring to irreconcilable findings (*id*. at p. 682), the Court of Appeal cited to *Campbell v. Zokelt* (1969) 272 Cal.App.2d 315, in which the Court of Appeal concluded the general verdict for the plaintiff on her negligence claim against one of two defendants arising from a car accident was inconsistent with the verdict in favor of the defendant on his cross-claim against a codefendant, which necessarily meant the jury found the defendant was not negligent in the accident. (*Id*. at pp. 319-320.)

27

reasonable accommodation because jury could have found the parties never reached the stage of deciding what accommodation was necessary].)  Only "if the verdict is hopelessly ambiguous, hopelessly inconsistent or incomprehensible" must it be set aside. (*Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 375 [reversing judgment and remanding for new trial as to damages where verdicts against joint tortfeasors were not reconcilable].)

> b.      *Standard of review*

"[A]s a general matter, orders granting a new trial are examined for abuse of discretion."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859; accord, *Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 323; see *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 ["The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.  This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter."].)  However, "any determination underlying [the] order is scrutinized under the test appropriate to such determination."  (*Aguilar*, at p. 859; accord, *Tun* at pp. 323-324 [new trial order predicated on issue of statutory interpretation reviewed de novo].)

Here, the trial court's order granting a new trial was based on its determination the verdict for the Fox defendants on elder abuse was inconsistent with the verdict for the Rosses on fraud, securities fraud, and breach of fiduciary duty.  The Rosses contend this presents a legal question premised on undisputed facts subject to de novo review, citing cases in which the

28

appellate courts independently reviewed inconsistent special verdicts.[19]  (See, e.g., *Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038 ["On appeal, we review the special verdict de novo."]; *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358  ["On appeal, we review a special verdict de novo to determine whether its findings are inconsistent."]; *City of San Diego, supra*, 126 Cal.App.4th 668, 678 ["[A] special verdict's correctness must be analyzed as a matter of law."].)

The Fox defendants argue de novo review applies only to interpretation of a special verdict, not a general verdict, because, as the Court of Appeal concluded in *City of San Diego, supra*, 126 Cal.App.4th at page 345, a special verdict "requires the jury to resolve all of the controverted issues in the case, unlike a general verdict which merely implies findings on all issues in one party's favor." (See *Singh v. Southland Stone, U.S.A., Inc., supra*, 186

---

[19]  Contrary to the Rosses' contention, the jury returned a general verdict, not a special verdict or verdict with special findings.  "A general verdict is that by which [the jury] pronounce[s] generally upon all or any of the issues, either in favor of the plaintiff or defendant; a special verdict is that by which the jury find[s] the facts only, leaving the judgment to the Court."  (§ 624; see *Shaw, supra*, 83 Cal.App.4th at p. 1347, fn. 7.) A verdict form that asks the jury "to find for plaintiff or defendant on each cause of action [is] unmistakably a series of general verdicts."  (*Shaw*, at p. 1347, fn. 7.)  In this case the jury decided as to each defendant whether the defendant was liable as to each plaintiff on each cause of action and specified the total damages.  The only specific finding was that the Fox defendants acted with "malice, fraud, or oppression" as a predicate to the punitive damages trial.  This finding did not convert the general verdict into a special verdict.

Cal.App.4th at p. 358 [reviewing special verdict for inconsistency de novo, explaining that "[w]ith a special verdict, unlike a general verdict . . . a reviewing court will not infer findings to support the verdict"].) By contrast, "'the jury's general verdict "imports findings in favor of the prevailing party on all material issues; and if the evidence supports implied findings on any set of issues which will sustain the verdict, it will be assumed that the jury so found."'" (*Morin v. ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 210, disapproved on another ground in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.) Further, "'[i]t is the function of the trial judge to interpret the [general] verdict from its language considered in connection with the pleadings, evidence and instructions.'" (*OCM, supra*, 157 Cal.App.4th at p. 881; accord *Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456.)

We agree with the Fox defendants an abuse of discretion standard applies here. Resolution of the asserted inconsistency in the general verdict turns primarily on factual issues. The trial court was in the best position to determine how the jury's verdicts on fraud and elder abuse could be reconciled in light of the pleadings, evidence, and jury instructions. Further, to the extent the trial court failed to exercise its discretion to determine whether the verdicts could be reconciled, this was an abuse of discretion. (*Fadeeff v. State Farm General Insurance Co.* (2020) 50 Cal.App.5th 94, 104 ["A trial court's failure to exercise discretion is itself an abuse of discretion."]; accord, *Kim v. Euromotors West/The Auto Gallery* (2007) 149 Cal.App.4th 170, 176.)

30

### c. *The trial court abused its discretion*

In granting the Fox defendants' motion for a new trial, the trial court did not attempt to interpret the verdict "so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.'" (*OCM, supra*, 157 Cal.App.4th at p. 877.) This was an abuse of discretion. Further, the verdicts were not factually inconsistent.

In his JNOV motion, Jerry argued that the verdicts on fraud, securities fraud, and breach of fiduciary duty "compelled" the jury to enter a verdict for Jerry on elder abuse because Jerry was over 65 years of age at the time of some of the Fox defendants' conduct. The Fox defendants in their motion for a new trial agreed with Jerry that "a verdict on one [claim] 'compelled' the same verdict on the other," but they argued the proper remedy for inconsistent verdicts was to order a new trial. The trial court, in denying Jerry's JNOV motion, found that "it is undisputed that Jerry Ross invested with [d]efendants while he was 65 years or older. That being the case, the jury's verdict on Jerry Ross'[s] elder abuse cause of action is inconsistent with its verdict on the causes of action for breach of fiduciary duty, fraud and securities fraud." In the same order, the court granted the Fox defendants' motion for a new trial, but the court made no additional findings and gave no reasons for its order other than noting "[d]efendants agree the verdicts on Jerry Ross'[s] claims are inconsistent."[20]

---

[20]  The only findings the trial court made were in connection with its order granting a new trial on Eric and Zipkin's claims, finding their claims "rely heavily on the interactions between Jerry Ross and [d]efendants, and their claims are substantially

31

The trial court abused its discretion in failing to examine the verdict in the context of the pleadings, evidence, and jury instructions to determine if it was possible to reconcile the jury's findings on the fraud-related claims and elder abuse. (*OCM, supra*, 157 Cal.App.4th at p. 877; *Wysinger v. Automobile Club of Southern California, supra*, 157 Cal.App.4th at p. 424.) Further, where the trial court fails to attempt to reconcile the verdict "or has interpreted it erroneously, the appellate court will interpret the verdict if it is possible to give a correct interpretation." (*OCM*, at p. 881; accord, *Mixon v. Riverview Hospital, supra*, 254 Cal.App.2d at p. 375.)

Under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.), an elder is defined as any person residing in California who is 65 years of age or older. (*Id*. § 15610.27.) Financial abuse of an elder occurs when a defendant "[t]akes, secretes, appropriates, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both." (*Id*. § 15610.30, subd. (a)(1).) The jury was instructed with CACI No. 1900 (intentional misrepresentation), No. 1901 (concealment), No. 1902 (false promise), and 4111 (constructive fraud), all of which require intent to deceive and resulting harm. Accordingly, interpreting the jury's verdict finding Jerry committed fraud so as to uphold it (*OCM, supra*, 157 Cal.App.4th at p. 877), the jury must have found Fox had the "intent to defraud" Jerry.

---

intertwined with those of Jerry Ross, both factually and legally." Because we conclude the trial court abused its discretion in ordering a new trial as to Jerry, it likewise abused its discretion in ordering a new trial for Eric and Zipkin on the same grounds.

If we seek to reconcile the jury's verdict on elder abuse, the jury must have found Jerry was not an elder at the time the Fox defendants defrauded him. This finding was not unreasonable when viewed through the lens of the jury instruction. As discussed, the trial court instructed the jury with a modified version of CACI No. 3100 that required the jury to find the Fox defendants "took Mr. Ross's investment monies . . . with the intent to defraud him," that Ross was "age 65 or older at the time of [d]efendants' conduct," and the "conduct was a substantial factor in causing his harm." However, Jerry asserted a single cause of action for elder abuse that alleged fraud in connection with the 11 syndications in which Jerry invested (likewise the Rosses alleged single causes of action for fraud, securities fraud, and breach of fiduciary duty). The Rosses presented their case as a single fraudulent scheme continuing from 2004 to 2012 (with damages accruing through 2018), focusing on the first syndication (Provinces in 2004) to show Fox's overt misrepresentation about the nature of the investment scheme and Jerry's reliance. The Rosses relied on subsequent syndications as examples of how the investor overcharges were secreted into ACF commissions and consulting fees (e.g., Writer Square in 2008), and how the Fox defendants tried to conceal the scheme (e.g., Bell Creek in 2010).

Jerry testified he relied on Fox's initial representations in 2004 that Fox had earned his returns through a management fee and invested in the properties "in the same way the investors do." When Jerry first invested in Provinces on behalf of Eric and Zipkin in 2004 and on his own behalf in Highlands Ranch in 2005, Jerry thought the purchase price on the offering documents represented the price of the shopping center, and Jerry testified

33

he would not have invested with ACF if he had known otherwise. But Jerry did not turn 65 until after these two investments—in 2006.

The jury could reasonably (but erroneously) have concluded the fraudulent conduct occurred before Jerry turned 65, even though the fraud continued after Jerry turned 65 because the Fox defendants continued to take Jerry's investment money until 2012. Thus, on the peculiar factual scenario in this case, the jury's verdict for the Fox defendants on elder abuse was not factually inconsistent with its verdicts for Jerry on his claims for fraud, securities fraud, and breach of fiduciary duty.

*Hasson v. Ford Motor Company* (1977) 19 Cal.3d 530, overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, relied on by the Rosses, supports this result. In *Hasson*, the plaintiff asserted causes of action for strict products liability and negligence against an automobile manufacturer, alleging he was injured as a result of a brake failure caused by vaporization of his vehicle's brake fluid. The jury found for the plaintiff on both counts, but it made special findings that there was no defect in the vehicle at the time the vehicle was manufactured, and the manufacturer was negligent. (*Hasson*, at pp. 539-540.) On appeal, the manufacturer argued the special finding of no defect was inconsistent with the jury's finding the manufacturer was negligent. (*Id.* at p. 540.) The Supreme Court held the verdict was not necessarily inconsistent because "the jury may have concluded that the braking system and the fluid were, at the outset, sound and fit for their intended purpose, but that [the manufacturer] was nonetheless liable for its failure during the ensuing four years to warn of conditions which might develop in use . . . . [S]uch conclusions would find

34

support in the evidence.  Additionally, they would have *permitted* the jury to find a 'defect' under the broadest definition of that term included in the instructions.  On the other hand, such a view of the evidence is also consistent with the jury's actual expression of its findings."  (*Id.* at p. 543; see *Fuller v. Department of Transportation, supra,* 38 Cal.App.5th at p. 1040 [in an injured bus passenger's action against Caltrans, a special finding that a dangerous road condition existed was not inconsistent with a special finding that the condition did not create a foreseeable risk of harm, because the jury was properly instructed that the plaintiff's harm had to relate to the road condition, and the verdict form did not require the jury to differentiate between the two different dangerous road conditions presented at trial].)  So too here, although the jury's findings of fraud could have supported a verdict of elder abuse given the undisputed fact of Jerry's birthdate, the jury could also have reasonably found there was no separate act of fraud (as opposed to a continuing course of fraudulent conduct) after Jerry turned 65.

The cases cited by the Fox defendants in which a general verdict was held to be fatally inconsistent are distinguishable in that in each case the jury's findings on one claim necessitated a contrary verdict on another claim.  For example, in *Shaw, supra*, 83 Cal.App.4th at pages 1344 to 1345, the Court of Appeal concluded in an employee's wrongful termination action that the jury's verdict for the employer on the employee's breach of contract claim was inconsistent with the jury's verdict for the employee on his claim for breach of the implied covenant of good faith and fair dealing, reasoning that the jury must have necessarily found the plaintiff was an at-will employee (by

35

rejecting the claim for breach of contract), but the finding of bad faith implied the jury believed the employee could only be dismissed for cause. (See also *Stillwell v. The Salvation Army, supra*, 167 Cal.App.4th at p. 363 [in wrongful termination action, parties conceded on appeal that a special verdict finding there was an at-will employment agreement was inconsistent with a special verdict finding the employer breached an implied agreement to terminate the employee only for cause]; *Morris v. McCauley's Quality Transmission Service, supra*, 60 Cal.App.3d at p. 970 [verdict for the defendant on personal injury claim asserted on behalf of child was inconsistent with verdict awarding damages to the child's mother for the child's medical expenses, requiring new trial].)

> 2. *Jerry is not entitled to JNOV on elder abuse*

Jerry contends he was entitled to JNOV on elder abuse because "the findings of fraud, damages and malice do in fact compel a finding for Jerry on the elder abuse claim as a matter of law" as to investments he made after he turned 65. Jerry's argument ignores the standard of review we apply to a motion for JNOV.

"'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770; accord, *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313 (*Johnson & Johnson*).) "'On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting

36

the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion.'" (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 684; accord, *Cabral*, at p. 770.) "'On appeal, we review the motion de novo. "[W]e determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict."'" (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1048.) "'"'If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied.'"'" (*Johnson & Johnson*, at p. 313, quoting *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.)

As discussed, financial elder abuse occurs when a defendant "[t]akes, secretes, appropriates, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both." (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) A "wrongful use" occurs "if, among other things, the [defendant] takes, secretes, appropriates, obtains, or retains the property and the [defendant] knew or should have known that this conduct is likely to be harmful to the elder . . . ." (*Id.*, § 15610.30, subd. (b); accord, *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 656.) Here, the Fox defendants presented evidence at trial that Fox disclosed to Jerry that the purchase price on the offering documents was not precisely the same as the price of the shopping centers. For example, the Fox defendants introduced emails in which Fox told Jerry in May 2005 (when Jerry was 63) that Highlands Ranch was being "offered virtually at acquisition cost," and again in July 2007 (when Jerry was 65) that Fox was selling an interest in North

37

Oak Marketplace "at approximately my cost."[21] Jerry testified these statements did not put him on notice the purchase price in the offering documents was different from the cost of the shopping centers, and instead he thought Fox was offering him a discount. But Jerry admitted he had seen these statements, and on a motion for JNOV we must accept "any substantial evidence, contradicted or uncontradicted" that supports the verdict for the Fox defendants. (*Newland v. County of Los Angeles, supra,* 24 Cal.App.5th at p. 676.) Drawing all inferences in favor of the verdict for the Fox defendants on elder abuse, the jury could have reasonably inferred as to investments made after Jerry turned 65 either that Fox did not deceive Jerry or that Jerry did not reasonably believe the purchase prices were identical to the price the LLC's paid for the shopping centers, and therefore Jerry was not harmed by the asserted misrepresentations and omissions in the offering materials. The trial court therefore did not err in denying Jerry's motion for JNOV. (*Johnson & Johnson, supra*, 37 Cal.App.5th at p. 313.)

We recognize this is an unusual result given our conclusion that the jury, in delivering a verdict for the Rosses on their fraud claims and awarding damages for the entire 14-year period during which Jerry invested with Fox, necessarily found that Fox

_____

[21]     We note that Fox's representation that "Highlands Ranch" was offered "virtually at cost" was false, as Highlands Ranch was marked up by more than $1 million, but Fox's representation (after Jerry was 65) that North Oak was offered "at approximately my cost" was plausibly true, as it was marked up by only $156,324, the smallest markup of all 13 investments. But regardless of whether the statements were true, they are relevant to Jerry's reliance on the representations regarding the purchase price of the shopping centers.

38

defrauded Jerry after Jerry turned 65. But our holding that the verdicts can be reconciled is based on the jury's potential confusion arising from the jury instruction on elder abuse. By contrast, as discussed, we must review the trial court's denial of Jerry's motion for JNOV by considering whether there is substantial evidence to support the elder abuse verdict. Jerry's argument would turn the standard for JNOV on its head by having us bootstrap our conclusion in reconciling the verdicts in the context of the Fox defendants' new trial motion to circumvent the standard for a JNOV motion that instead looks at whether there is substantial evidence to support the jury's verdict for the Fox defendants. There is.

B.    *The Fox Defendants' Cross-appeal*

    1.    *The trial court did not err in its rulings concerning Albert's testimony*

The Fox defendants contend the trial court abused its discretion in allowing nonparty Carl Albert to testify about his investments and communications with Fox because the Rosses failed to disclose Albert in discovery and to produce documents they received from him. The Fox defendants further contend the court abused its discretion in limiting their cross-examination of Albert. We find no abuse of discretion as to the first contention and no prejudicial error as to the second.[22]

---

[22]    The Fox defendants presented their arguments concerning Albert's testimony in their combined respondents' brief (on the Rosses' appeal) and opening brief (on the Fox defendants' cross-appeal), then again in their reply brief on the cross-appeal. Because the arguments regarding Albert's testimony are relevant to both the appeal and cross-appeal, we deny the Rosses'

a.     *Albert's testimony*

Albert testified that he invested in 10 Fox syndications beginning in 2002, including an investment of $108,000 in Bell Creek Commons in 2010.  At the beginning of their relationship, Fox told Albert "that the way [Fox] structured his deals was that he and his family invested, very heavily, their own cash in every deal.  As [Fox] said, they purchased for, cash, 25, up to 50 percent or more of every shopping center.  And that he allowed friends and family, investors that he had interviewed to co-invest with him on the very same terms he co-invested."  Fox also told Albert "the only compensation or profit or fee [Fox] ever charged was for his management work, which was four percent of the gross income, and that he took no other form of profit, charge, commissions and any other thing than his management fee.  And then [he earned] the profits on the amount of money he . . . and his family invested . . . in the centers as investors did."  Albert received the same offering documents for Bell Creek Commons that Jerry did, including a stated purchase price of $12.5 million.  Albert assumed the price reflected what was paid to acquire the shopping center, and Fox never indicated otherwise.

In late 2016 Albert received a letter from Fox informing him that Fox had been sued and the lawyers for the plaintiffs had obtained a list of investors and might contact him.  Albert later received a letter from the Rosses' lawyers, Richard Leonard and Steven Schuman.  Albert asked the Rosses' lawyers for a copy of

November 9, 2020 motion to strike as an improper surreply the discussion of Albert's testimony in the Fox defendants' reply brief.

40

the complaint and met with them sometime in 2017. The lawyers showed Albert a copy of the closing statement for the Bell Creek Commons reflecting that the property had been purchased for $11.1 million. Albert then contacted Fox and told him the $1.4 discrepancy in the price "needed an explanation; that [the prices] were inconsistent, and I felt I had been lied to."

During cross-examination, Albert acknowledged he harbored animosity toward Fox and had told Fox he was going to sue him. However, when the Fox defendants' attorney asked, "Are you attempting to get money from my client now in a settlement?," the trial court sustained the Rosses' objection under Evidence Code section 1152.[23] The Fox defendants' attorney then asked, "Would you agree . . . that your relationship with my client, as of today, is adversarial?" Albert answered, "Yes."

During cross-examination, the trial court sustained the Rosses' relevance objections to several questions about Albert's profits from ACF syndications in which the Rosses did not invest. At sidebar, the Fox defendants' attorney argued he was "being prohibited from doing an aggressive[] cross-examination of this witness," but the court sustained the objections and instructed counsel to move to a new line of questioning. The court explained, "[T]he purpose of examination of witnesses in trial is for the very concise presentation of evidence, not to do discovery.

---

[23] Evidence Code section 1152, subdivision (a), provides, "Evidence that a person has, in compromise . . . , furnished or offered or promised to furnish money . . . to another who has sustained . . . or claims that he or she has sustained . . . loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

41

And at this point the cross-examination is starting to veer far outside of what the scope of what the issues are in this case and the issues that were testified to on the direct."

b.  *The Rosses' failure to disclose Albert in discovery*

On February 13, 2017 Albert met with Fox and presented him with a 10-page letter questioning him in detail about the Shreve City Shopping Center syndication and undisclosed "profits, benefits, fees, charges, commissions, refinancing fees, management fees, and gains of any and all kinds paid to or collected by you, or any entity affiliated with or related to you in any manner."  Albert took notes at the meeting.

Schuman began representing Albert in March 2017.  On June 14, 2017 Albert sent a copy of his notes from the February 13 meeting with Fox to Schuman.  Schuman's billing records for the Ross matter reflect a June 14 conversation between Schuman and Albert.

On September 14, 2017 Schuman deposed Fox and asked several questions about Albert, including whether Albert had complained to Fox, demanded to be bought out, or claimed to have been defrauded.  Fox responded, "Albert earlier this year asked me if I'd purchased properties at one price and sold them at another price."

On September 20, 2017 the Fox defendants served a supplemental interrogatory asking Jerry to update his 2015 form interrogatory responses.  Form interrogatory no. 12.1 of the 2015 discovery asked Jerry to identify anyone who witnessed or had information about the "incident," defined as "[t]he events and circumstances of the sale and purchase of real estate, interests in

[LLC's], secret profits, and the alleged resulting damages." Jerry responded, "Plaintiffs believe that other investors who invested with the [d]efendants have relevant knowledge about the investments" but "[t]he exact information they have is not currently known to [p]laintiffs."[24] Special interrogatory no. 25 of the 2015 discovery asked Jerry to identify all persons with information relevant to the Rosses' contentions that the offering materials were materially false. In his supplemental response served on October 25, 2017, Jerry objected to the question, but included in his response "all other investors in any of the ACF-sponsored investments in which any of the [p]laintiffs invested." The special interrogatories also asked Jerry to identify all persons with information that the Fox defendants lied about the purchase price of the properties. Jerry interposed numerous objections and responded, "The statute."

On September 20, 2017 the Fox defendants served a supplemental request for the production of documents that requested Jerry provide additional documents responsive to the Fox defendants' earlier request for documents related to communications between the Rosses and third parties about the purchase price and "purported wrongful conduct of the conspiracy."

---

[24] Schuman stated in a declaration filed in opposition to the Fox defendants' new trial motion that he had never heard of Albert prior to December 2016, when he received a list of ACF investors in discovery. He also stated he did not believe any discovery served on the Rosses called for the identification of Albert because Albert had no firsthand knowledge of what Jerry did or was told.

Jerry did not identify Albert or produce Albert's meeting notes in his responses to any of the supplemental interrogatories or document demands. On January 3, 2018, after the close of discovery and five months before trial, the Rosses served a proposed trial witness list on the Fox defendants, identifying Albert as a witness. On January 19 the Fox defendants filed a motion in limine to preclude Albert from testifying on the grounds that Albert had no personal knowledge of the Rosses' dealings with Fox, his testimony would be unduly prejudicial and constitute improper character evidence, the Rosses had not disclosed him in discovery, and he had not been deposed. The motion did not identify or provide the discovery demands that called for Albert's disclosure. Nor did the Fox defendants request to depose Albert.

At a May 29, 2018 hearing, the trial court denied the Fox defendants' motion in limine as to Albert without prejudice, explaining, "[The Fox defendants] have the burden of showing you asked for this information in discovery and didn't get it—on the motion it wasn't done. [¶] If you can show me that the witness was hidden from you and that there was a willful nondisclosure[, that] is what the code is going to require for me to exclude a witness." The Fox defendants renewed their motion on June 12, 2018, just prior to Albert's testimony, and the court again denied the motion on the ground the Fox defendants had not presented the discovery calling for Albert's identification or the Rosses' objections and responses. The court stated, "[Y]ou have the burden of showing me that you asked for it; and I've given you what, one, two, three, four, five days to get that information, and you don't have it."

As described in the Fox defendants' motion for a new trial, Albert filed his own lawsuit against the Fox defendants after the conclusion of the Rosses' trial, and Albert was deposed in that action on October 19, 2018. Albert testified that he retained Schuman's law firm in March 2017. He also produced documents that the Fox defendants argued in their motion for a new trial revealed "[p]laintiffs' undisclosed relationship with Albert." Among them, handwritten notes dated February 7 and February 22, 2017 show Albert had a telephone call with Eric's stepfather, who gave Jerry's home telephone number to Albert; a June 14, 2017 email forwarding Albert's notes of his February 13, 2017 meeting with Fox (but not indicating to whom); and a blind copy to Schuman and Leonard of a March 22, 2018 email Albert sent to Fox regarding a draft settlement agreement.

c.      *The Rosses' failure to disclose Albert does not constitute grounds for reversal or a new trial*

The Fox defendants argued in their motion for a new trial that in failing to disclose Albert in discovery, the Rosses deprived them of the opportunity to learn Albert was closely aligned with the Rosses, he had coordinated his testimony with the Rosses to advance his own claims against Fox, and the Rosses' attorneys had obtained information before trial relating to Albert's meetings with Fox. Because the trial court ordered a new trial on a different ground, we review these alternative grounds for a new trial independently. (See *Thompson v. Friendly Hills Regional Medical Center* (1999) 71 Cal.App.4th 544, 550 ["We independently review all the grounds advanced for the new trial motion and will sustain the order 'if it should have been granted

45

upon any ground stated in the motion, whether or not specified in the order or specification of reasons . . . .'"].)

The Fox defendants argued in their motion for a new trial under section 657, subdivision 1, that the trial court erred in denying their motion in limine to exclude Albert's testimony and in allowing Albert to testify without disclosing relevant documents, which rendered the trial unfair. Section 657, subdivision 1, authorizes a new trial to be ordered where there was "irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial." "An 'irregularity in the proceedings' is a catchall phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party 'cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits.'" (*Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1229-1230, citing *Gay v. Torrence* (1904) 145 Cal. 144.) We generally review a ruling on a motion in limine regarding witness testimony for an abuse of discretion. (*Osborne v. Todd Farm Service* (2016) 247 Cal.App.4th 43, 50-51; *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 336.) There was no abuse of discretion.

"Precluding a witness from testifying at trial is proper where a party *willfully and falsely* withholds or conceals a witness's name in response to an interrogatory. [Citation.] 'Where the party served with an interrogatory asking the names of witnesses to an occurrence then known to him deprives his adversary of that information by a willfully false response, he subjects the adversary to unfair surprise at trial.'" (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332. (*Saxena*))

46

But it does not follow "that evidence may be excluded on the ground an interrogatory answer is evasive or incomplete. The Civil Discovery Act (§ 2016.010 et seq.) provides specific remedies for evasive or incomplete discovery responses." (*Saxena, supra*, 159 Cal.App.4th at pp. 332-333.) Where a party fails to answer or provides an evasive answer, the propounding party must first file a motion for an order compelling a response or further response before moving for evidentiary sanctions. (*Id.* at p. 334; see § 2030.300, subd. (e) [evidence and issue sanctions only available for failure to obey an order compelling further responses].) "The party moving to exclude evidence as a sanction for discovery abuse has the initial burden of establishing grounds supporting the request." (*Saxena*, at p. 334.)

The trial court twice advised the Fox defendants' attorneys they needed to identify the specific discovery requests propounded and the responses made by the Rosses so the court could determine if "the witness was hidden from [them] and that there was a willful nondisclosure." The Fox defendants did not meet their burden to demonstrate there was a willful disclosure that supported exclusion of Albert's testimony absent the filing of a motion to compel further responses.

However, the Fox defendants also moved for a new trial under section 657, subdivision 4, which provides for the granting of a new trial based on "[n]ewly discovered evidence, material for the party making the application, which [the party] could not, with reasonable diligence, have discovered and produced at the trial." (See *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161-1162 & fn. 5 [personal injury plaintiffs entitled to a new trial in product defect action where manufacturer concealed reports of similar incidents because it

47

deprived the plaintiffs of a chance to "tell the jury the whole story"].) "'Material' in this context means '"likely to produce a different result."'" (*Id.* at p. 1161; accord, *In re Marriage of Smyklo* (1986) 180 Cal.App.3d 1095, 1101.)

The Fox defendants in their motion for a new trial relied on emails and deposition testimony they obtained from Albert's subsequent lawsuit—which were not available to the Fox defendants at the time of trial— that demonstrate Jerry (through his attorneys) was well aware of Albert's relevant knowledge when Jerry responded to the Fox defendants' discovery. And unlike their motion in limine, the Fox defendants provided the court with the interrogatories and document demands that reasonably called for the identification of Albert, as well as Jerry's responses that showed Jerry was not forthright when he responded that he "believe[d] that other investors who invested with [d]efendants have relevant knowledge" but "[t]he exact information they have is not currently known to [p]laintiffs." The record shows the contrary.

However, the Fox defendants have not demonstrated the evidence discovered after the trial was material. To the contrary, the evidence produced by Albert is consistent with his trial testimony. Albert testified he bore animosity toward Fox, was in an "adversarial" position, and had threatened to sue him. Albert testified he saw the same offering documents that Jerry had seen, and Fox had lied to him about the amount that was paid to purchase the Bell Creek Commons. Further, between 2002 and 2017 Fox never disclosed that ACF took fees or commissions beyond the 4 percent management fee. Albert also testified he believed Fox lied to him about the acquisition of the Shreve City Shopping Center in which Albert was currently investing. The

later-discovered evidence did not shed any light on Albert's hostility toward Fox. For example, the Fox defendants emphasize that they learned the Rosses received a copy of Albert's demand letter and notes of his February 2017 meeting with Fox, but Fox was (obviously) present at the meeting and had received the demand letter.

The Fox defendants argue on appeal that had the Rosses identified Albert in discovery, "[d]efendants would have deposed him and would have learned that he was not a third party, but rather, was a "was a co-client with Plaintiffs." But Albert was not a "co-client" (or coplaintiff)—he was a third party who was pressing similar claims. And the Fox defendants' lawyers could have anticipated after Fox's February 2017 meeting with Albert that the Rosses' lawyers might represent Albert. As discussed, Fox sent a letter to Albert in late 2016 advising him that his name had been provided to the lawyers for the Rosses, and the lawyers might contact him. Further, once Albert was disclosed as a witness, the Fox defendants could have requested leave to take his deposition during the remaining five months before trial, but they failed to do so.

> d.     *The trial court did not commit prejudicial error in limiting the Fox defendants' cross-examination of Albert*

The Fox defendants also contend the trial court abused its discretion by sustaining the Rosses' attorney's objection under Evidence Code section 1152, subdivision (a), as to questioning about whether Albert was attempting to obtain money from Fox in a settlement. We agree this was an abuse of discretion. (See *Diamond v. Reshko* (2015) 239 Cal.App.4th 828, 841 [trial court

49

ruling on motion to exclude under Evidence Code section 1152 is reviewed for abuse of discretion]; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 32 [same].) Evidence Code section 1152, subdivision (a), provides that an offer of compromise is inadmissible to prove the liability of the offeror for the loss or damage, but it is not a basis to exclude a settlement demand as evidence of the demanding party's motives. (See *HMS Capital, Inc. v. Lawyers Title Company* (2004) 118 Cal.App.4th 204, 219 [settlement demand admissible to show malice in threatening prosecution]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 915 [unreasonably low settlement offer admissible to show insurer's bad faith].)

Although the trial court abused its discretion in sustaining the Rosses' objection, it was not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 836 applies to civil cases].) After the court sustained the Rosses' objection, the court allowed the Fox defendants to examine Albert further about his hostility toward Fox, continuing into a second day of cross-examination. Albert testified he felt animosity toward Fox, he had threatened to sue him, and their relationship was adversarial. The only time the court admonished the Fox defendants' attorney to be concise and to "move to a new line of questioning" occurred when the attorney repeatedly asked Albert about the profits Albert made on investments with ACF in which the Rosses had not invested. The Fox defendants have therefore not demonstrated any

material limitation on their cross-examination into Albert's biases, let alone grounds for reversal.[25]

> 2. *The trial court did not abuse its discretion in denying the Fox defendants' oral motion to exclude Habibi from testifying*

The Fox defendants contend the trial court erred in denying their oral motion to preclude Habibi from testifying because he refused to produce the offering documents he issued as a syndicator but then relied on the documents in his testimony. The Fox defendants did not meet their burden to show their entitlement to evidentiary sanctions.

> a. *Relevant proceedings*

In October 2017 the Rosses designated Habibi as an expert to testify "as to the standards in the syndication business, including: how disclosure should be made, . . . how investment and other funds are maintained and accounted for. Mr. Habibi

---

[25] The cases cited by the Fox defendants involve extreme restrictions on cross-examination that are not present here. (See *People v. Pantages* (1931) 212 Cal. 237, 256 [order preventing defense counsel from asking prosecution witness any questions about whether there were charges pending against him was improper, and along with several other trial errors, constituted grounds for reversing the denial of defendant's motion for a new trial]; *Ogden Entertainment Services v. Workers' Comp. Appeals Bd.* (2014) 233 Cal.App.4th 970, 984 [where employer's cross-examination of the claimant was not "merely curtailed," but rather "did not take place at all, except for a few minutes," there was a denial of due process compelling annulment of appeal board decision].)

will also testify concerning the accuracy and sufficiency of the disclosures made by [d]efendants, including but not limited to the representations made in the [e]xecutive [s]ummaries and [f]inancial [p]rojections for each of the relevant investments." The Fox defendants promptly served a notice of deposition with dozens of document demands, including a request for "[a]ll documents which Mr. Habibi has relied upon in forming his opinions or conclusions in this case." The Rosses timely served objections, asserting the request was overbroad and unduly burdensome.

The Fox defendants deposed Habibi in February 2017. Habibi was asked if his opinions were based in part "on [his] experience in [his] specific deals [as a syndicator] in Kansas City and Los Angeles." Habibi answered, "part of my opinion, yes." The Fox defendants' attorney then asked Habibi to provide his "offering documents for those Kansas City and L.A. deals." Habibi refused on the advice of counsel.

On April 3, 2018 the Fox defendants filed a motion seeking monetary, evidentiary, and issue sanctions against the Rosses. As part of the motion, the Fox defendants sought to exclude Habibi "from testifying at trial, or in the alternative ordering him to produce all documents he relied upon in arriving at his opinions[.]" The Fox defendants requested this sanction pursuant to section 2034.300, subdivision (c), which provides the trial court may exclude the opinion of an expert where the offering party unreasonably fails to "[p]roduce reports and

writings of expert witnesses under [s]ection 2034.270."[26]  The court denied the sanctions motion.

On June 13, 2018, the day Habibi was scheduled to testify, the Fox defendants brought an oral motion to preclude Habibi from testifying on the grounds Habibi would testify to damages outside the scope of his expert designation, and he failed to produce the offering documents for his syndications.  In response to the trial court's inquiry as to the documents, the Fox defendants' attorney conceded he had not filed a motion to compel further production.  He argued he was instead proceeding under section 2034.300, subdivision (c), based on the Rosses' failure to produce writings of an expert witness required under section 2034.270.  The court denied the motion, finding the Fox defendants failed to produce the deposition notice or the Rosses' objections; there was no appearance of gamesmanship by the Rosses' attorneys; and the Fox defendants' attorney made a "strategic litigation choice to proceed in this manner" (without first filing a motion to compel further responses) and had "the opportunity to raise these objections earlier . . . to give plaintiff any opportunity to correct any defects."  The court concluded, "I

---

[26]    Section 2034.270 provides, "If a demand for an exchange of information concerning expert trial witnesses includes a demand for production of reports and writings as described in subdivision (c) of [s]ection 2034.210, all parties shall produce and exchange, at the place and on the date specified in the demand, all discoverable reports and writings, if any, made by any designated expert . . . ."  Section 2034.210, subdivision (c), provides, in turn, that "[a]ny party may also include a demand for the mutual and simultaneous production for inspection and copying of all discoverable reports and writings, if any, made by any expert . . . in the course of preparing that expert's opinion."

cannot make a determination that there was non-compliance with the Code. But to the extent that there was any non-compliance, I do not find that it was unreasonable."

> b. *The trial court did not abuse its discretion in denying the motion to exclude Habibi's testimony*

The trial court did not abuse its discretion in denying the motion to exclude Habibi's testimony. Contrary to the Fox defendants' argument, the offering documents did not fall within section 2034.210, subdivision (c) (providing for a party to demand an exchange of reports or writings "made by any expert . . . in the course of preparing that expert's opinion"), and thus the documents were not subject to disclosure under section 2034.270, and Habibi's testimony was not properly excluded under section 2034.300, subdivision (c) (providing for exclusion of an expert's opinion for failure to comply with section 2034.270).

Rather, the Fox defendants' request for the offering documents was governed by the deposition procedures set forth in section 2025.010 et seq. (See § 2034.410 ["The procedures for taking oral and written depositions . . . apply to a deposition of a listed trial expert witness . . . ."].) The Fox defendants admit they never sought to compel further responses, a prerequisite to an evidentiary sanction for noncompliance absent a willful falsehood. (See § 2031.310, subd. (i) [evidence and issue sanctions only available for failure to obey an order compelling further production]; *Saxena, supra*, 159 Cal.App.4th at pp. 332-

54

333.)[27]  And they did not make their motion under section 2025.010, instead stating at the hearing they were moving under section 2034.300, subdivision (c).

###### 3. *The trial court did not abuse its discretion in allowing Habibi to provide an opinion on the Rosses' consequential damages*

The Fox defendants contend the trial court abused its discretion when it allowed Habibi "to opine on the legal measure of rescission damages."  They argue Habibi's opinions were legally incorrect and led the jury to award expectation damages, which are not available for rescission.  The trial court did not abuse its discretion in allowing Habibi to testify about the measure of consequential damages for rescission, and although part of Habibi's testimony was inaccurate, any error in allowing the testimony was harmless.

###### a. *Rescission and damages*

Civil Code section 1692 provides in relevant part, "A claim for damages is not inconsistent with a claim for relief based upon rescission.  The aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled;  but such relief shall not include duplicate or

---

[27]  It is also far from clear the Fox defendants had a right to demand Habibi turn over the offering documents from Habibi's own syndications.  Habibi did not testify at his deposition he intended to rely on the offering documents in presenting his expert opinions, but rather, that his opinions were based in part "upon [his] experience in [his] specific deals" as a syndicator.

inconsistent items of recovery." "Rescission extinguishes the contract (Civ. Code, § 1688), terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. [Citation.] Thus, the '[r]elief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the status quo ante, returning him to his economic position before he entered the contract.'" (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1145 (*Sharabianlou*), quoting *Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 316, fn. 15 (*Runyan*); accord, *Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1386.)

"The fundamental principle underlying these decisions [awarding consequential damages for rescission] and the awards which they upheld is that 'in such actions the court should do complete equity between the parties' and to that end 'may grant any monetary relief necessary' to do so." (*Runyan, supra*, 2 Cal.3d at p. 316; accord, *Wong v. Stoler, supra*, 237 Cal.App.4th at p. 1386; *Sharabianlou, supra*, 181 Cal.App.4th at p. 1144.) However, because "rescission is a remedy that *disaffirms* the contract," a party seeking damages under section 1692 is not entitled to recover damages "'for the loss of [their] "expectational interest"—the benefit of [the] bargain which full performance would have brought.'" (*Sharabianlou*, at p. 1145 [trial court erred in awarding the difference between the rescinded contract sale price and the amount received on a later sale of the subject property because this gave the plaintiff the benefit of the bargain].)

In *Runyan, supra*, 2 Cal.3d at pages 318 to 319, the Supreme Court found that where a franchise services contract

56

had been rescinded, the plaintiff who had acquired the franchise was entitled to recover for "his loss of income for the period from the execution of the . . . contract to the giving of the notice of rescission, this loss being measured by the salary he would have received had he remained at [his previous job].  We cannot find this award unreasonable or inequitable particularly since, as the [trial] court expressly found, plaintiff relied upon the contract in severing his relationship with [the previous employer]."

> b.     *The trial court did not abuse its discretion in allowing Habibi to testify about damages for rescission; although a portion of Habibi's testimony was erroneous, any error in admitting it was harmless*

Habibi testified on direct examination that he understood the Rosses to be seeking rescission of their investments.  When asked "what does that mean to you?" (without an objection by the Fox defendants), Habibi testified, "Rescission is a legal term.  I'll give you my understanding of it.  And that is, it's effectively undoing the investment and making it such as if the Rosses had never made those investments to begin with and instead had put those monies elsewhere or in some alternate scenario, if you will.  [¶]  So the rescission would consist of the Rosses giving back their interests in the ACF holdings . . . .  And then getting back their capital, plus a reasonable return thereon over the course of the . . . 14 years in which their money has been tied up in those deals."  Habibi was later asked, again without objection, "When the Rosses give back the shopping center interest that they're currently holding, do they get paid any money for those?"  Habibi answered, "No.  They're just giving them back because that's

57

effectively what rescission is. Rescission is a putting the Rosses back in a situation whereby they effectively hadn't bought into those shopping centers and the monies were invested in some alternative investment vehicle."

By failing to object to the questions asking Habibi to explain his understanding of rescission, the Fox defendants forfeited any objection. (*People v. Abel* (2012) 53 Cal.4th 891, 924 ["A defendant who fails to make a timely objection or motion to strike evidence may not later claim that the admission of the evidence was error"]; *People v. Jennings* (2010) 50 Cal.4th 616, 654 [failure to make hearsay objection to statement at trial forfeited claim on appeal].) Even if the Fox defendants had not forfeited their objection, the trial court did not abuse its discretion. An expert "'is not allowed "to testify to legal conclusions in the guise of expert opinion,"'" and "'"[t]he manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion."'" (*N.G. v. County of San Diego* (2020) 59 Cal.App.5th 63, 77.) However, it was appropriate for Habibi to provide his understanding of rescission as context for his opinions, and he provided a general description of rescission in his response, not a legal opinion as to whether the Rosses were entitled to rescission.

Further, Habibi's description of the damages available to Jerry based on rescission was accurate. The Fox defendants in their opening brief argue that Habibi testified the Rosses were entitled to their investment capital and "to get the 'reasonable return' on the capital they had expected to get from Mr. Fox." This mischaracterizes Habibi's testimony. Habibi testified the Rosses were entitled to "get[] back their capital, plus a reasonable return" during the time their money was tied up in the Fox

58

investments, as if the funds "were invested in some alternative investment vehicle." A consequential damages award that would give the Rosses a reasonable rate of return for the time during the 14-year period in which their money was tied up in the investments is a proper measure of damages to restore them to the status quo ante.[28] (*Runyan, supra*, 2 Cal.3d at p. 316, fn. 15; *Sharabianlou, supra*, 181 Cal.App.4th at p. 1144.)

Habibi's lowest measure of consequential damages based on the NAREIT index of returns from real estate investment trusts holding apartment buildings ($4.4 million) was proper. There was substantial evidence that at the time Jerry approached Fox in 2004, Jerry was an accredited investor who held investments in three apartment buildings, and Jerry intended to continue to invest in real estate in a manner that would achieve diversification and a "reasonable return on rents over the years and appreciation" without his being directly responsible for property management. In light of the evidence of the Rosses' investment goals at the time Jerry met Fox, the NAREIT apartment index was a reasonable measure of the return the Rosses would have received had they not invested with the Fox defendants.

However, two of the three damages estimates Habibi provided were based on incorrect measures of damages. One

---

[28]     The Fox defendants contend the proper measure of damages for rescission was prejudgment interest on the Rosses' investment instead of compensatory damages. But as in *Runyan, supra*, 2 Cal.3d at page 318, the Rosses were entitled to recover consequential damages from the time they made their investments, not from when they were in a position to make a demand that would support prejudgment interest.

calculation was based on a 22 percent projected rate of return that Fox advertised in a 2003 shareholder letter ($22.1 million). A damages award based on this projection would give the Rosses a return that is untethered to any evidence of what they might have actually received had they not invested with the Fox defendants. Habibi's estimate based on the average of returns projected by ACF on syndications in which the Foxes actually invested ($9.9 million) suffers from the same defect. Although this average more closely approximates what the Rosses might have achieved by investing in similar shopping mall syndications, Habibi's estimate was not based on data showing what ACF or any syndicator actually achieved, but from ACF's projections in connection with transactions with the Rosses.

Because the jury ultimately awarded the Rosses $4.3 million in damages, just short of Habibi's calculation based on the NAREIT index, in the absence of any other expert testimony on damages, it is not reasonable to assume the jury relied on either of the two other damages calculations (for $22.1 and $9.9 million). Thus, any error in allowing Habibi to provide the two additional calculations was harmless. (*Cassim v. Allstate Ins. Co., supra*, 33 Cal.4th at p. 801.)

4. *Any instructional error is harmless*

The Fox defendants contend the trial court erroneously instructed the jury on constructive fraud, the scope of a syndicator's fiduciary duty, and the voiding of contracts as against public policy, and the court failed to instruct the jury on consequential damages. Even if the instruction on constructive fraud was erroneous, any error was harmless. The Fox defendants' other contentions lack merit or were forfeited.

a.     *Standard of review*

"A party is entitled upon request to correct, nonargumentative [jury] instructions on every theory of the case advanced by [the party] which is supported by substantial evidence." (*Soule v. General Motors Corp., supra*, 8 Cal.4th at p. 572; accord, *Olive v. General Nutrition Centers, Inc.* (2018) 30 Cal.App.5th 804, 813.)  We review the record de novo to determine whether substantial evidence supported giving a refused jury instruction.  (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045; *Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 495.)  We also review de novo "'whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration.'" (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 713, quoting *People v. Posey* (2004) 32 Cal.4th 193, 218.)

b.     *Constructive fraud*

The trial court instructed the jury on constructive fraud with a modified version of CACI No. 4111.  The instruction stated the Rosses must prove six elements, including "[t]hat Alan Fox knew that the prices of the shopping centers were not as stated on the [offering documents]; and that, in fact, he was purchasing the shopping centers at lower prices."[29]  The Fox defendants contend this instruction "directed the jury to adopt [the Rosses']

---

[29]     The form CACI No. 4111 states as to this element, "That [*name of defendant*] knew, or should have known, that [*specify the information at issue*][.]"

61

view that the 'prices of the shopping centers'—rather than the prices of the LLC's that Plaintiffs were investing in—were what was ostensibly 'stated on the [offering documents].'" The Fox defendants argue that one of their key trial theories was that they did not intend the phrase "Purchase Price" in the offering documents to refer to the acquisition cost of the underlying properties, but rather, the purchase price of the LLC's, and the instruction therefore had the effect of directing the jury to find in favor of the Rosses on the constructive fraud claim because it was undisputed the purchase prices for the shopping centers stated on the offering documents were greater than the prices at which they were acquired.

The Rosses argue Fox's testimony that the purchase price on the offering documents was the price to buy an interest in the LLC (not the purchase price of the shopping center) was inconsistent with both Fox's testimony on cross-examination and the offering documents. Fox admitted as to Writer Square that the purchase price as used in the offering documents was "the price at which the LLC . . . paid to acquire 100 percent of the Writer Square property at the time of the executive summary" and reflected the value at which ACF "transferred the property to the LLCs." He also acknowledged that all of the terms used on the executive summary and financial projections (including the location, property description, and projected return) refer to the shopping center, not the LLC. The Fox defendants have not identified any evidence as to Writer Square or the other shopping centers that supports their position the purchase price in the offering documents represented the price of the LLC's, other than Fox's conclusory testimony that this was the case, offering an analogy to a coffee shop selling coffee.

62

Moreover, even if the trial court erred in not using Fox's version of the constructive fraud instruction based on his testimony that the purchase price reflected the price of the LLC's, the instruction as given did not direct a finding in favor of the Rosses. (See *Strouse v. Webcor Construction, L.P., supra*, 34 Cal.App.5th at p. 713.) Under the instruction, the Rosses needed to prove for each syndication that Fox knew the purchase price stated on the offering documents was different from the acquisition price of the property. But even if Fox knew the purchase price was different, the Rosses had to prove the fourth element of constructive fraud, "[t]hat Alan Fox misled [the Rosses] by failing to disclose this information." Had the jurors believed the Fox defendants' theory that the offering documents reflected the purchase price of the LLC's, not the properties, then they would not have returned a verdict for the Rosses because they would have found Fox did not mislead the Rosses by failing to disclose the purchase price of the properties. Therefore, any error in phrasing the constructive fraud instruction was harmless.

c.     *Scope of fiduciary duty*

The trial court instructed the jury on a syndicator's fiduciary duty with a modified version of CACI No. 4100 as follows: "A syndicator or promoter of investments owes what is known as a fiduciary duty to his or its investors . . . . [¶] . . . A fiduciary duty imposes on a syndicator a duty to act with the utmost good faith and in the best interest of . . . his or its investors." The Fox defendants contend the court erred in failing to instruct the jury further on the scope of a syndicator's fiduciary

63

duty pursuant to *Austin v. Hallmark Oil Co.* (1943) 21 Cal.2d 718, 728 (*Austin*).

The Fox defendants argue that under *Austin, supra*, 21 Cal.2d at page 728, the Fox defendants—as the promotors of the syndications—had a fiduciary duty to make disclosures about the costs involved in the LLC's purchase of the shopping centers only to individuals who were existing investors in the LLC's. (See *id.*, at p. 728 ["Whether Austin obtained a secret profit, however, turns upon whether he had a fiduciary duty to defendants at the time he acquired the alleged secret interest."].) Thus, the Fox defendants contend, they had no fiduciary duty to make disclosures to the Rosses because the Rosses did not invest in the LLC's until after the LLC's had purchased the properties. We do not reach whether modification of the fiduciary duty instruction would have been appropriate to focus on the timing of the Rosses' investment because the Fox defendants did not request modification of the instruction, thereby forfeiting the issue on appeal.

As the Fox defendants point out in their reply brief, a party does not forfeit an objection to a prejudicial jury instruction that incorrectly states the law. (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 705-706 ["'[W]hen a trial court gives a jury instruction which is prejudicially *erroneous as given*, i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal.'"]; see § 647 ["All of the following are deemed excepted to: . . . giving an instruction, refusing to give an instruction, or modifying an instruction requested"].) However, "'[w]here, as here, "the court

64

gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction in order to have the error reviewed.*"'" (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131(*Metcalf*); accord, *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 948, disapproved on another ground by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 575, fn. 4.)

The Fox defendants present no authority that CACI No. 4100 as given (which tracks the form instruction and applies it to a syndicator) provided an incorrect statement of the law. The Supreme Court's holding in *Austin, supra*, 21 Cal.2d at page 727, does not support the Fox defendants' contention. As the *Austin* court concluded, "Austin was a promoter of the Hallmark Oil Company, and as such had a fiduciary duty to disclose to defendants his interest in his transactions with or on behalf of the corporation." (*Ibid*.) The trial court's instruction using CACI No. 4100 provided, consistent with *Austin*, that a syndicator owes a fiduciary duty to his or its investors and has "a duty to act with the utmost good faith in the best interest of . . . his or its investors."

The Fox defendants did not request the trial court to modify the jury instruction to address the timing of investments made by investors in a syndication. Instead, the Fox defendants proposed a version of CACI No. 4100 that defined a fiduciary as "certain professionals such as agents, stockbrokers, attorneys, and corporate officers or partners" and stated "[a] fiduciary duty imposes on these professionals a duty to act with the utmost good faith in the best interests of his/her/its principal, client,

65

corporation, or partner."[30]  And at the hearing on the jury instructions, the Fox defendants primarily argued that syndicators do not owe fiduciary duties in several states in which the LLC's operated.  To the extent the Fox defendants believed they were entitled to a further pinpoint instruction on the scope and timing of the syndicator's fiduciary duty, they forfeited any objection by not proposing a further modification of the instruction.  (See *Metcalf, supra*, 42 Cal.4th at p. 1131; *Agarwal v. Johnson, supra*, 25 Cal.3d at p. 948.)

### d.     *Contracts against public policy*

The trial court instructed the jury with the text of Civil Code section 1668 as follows: "All contracts which have for their object directly or indirectly to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another or violation of law, whether willful or negligent, are against the policy of the law."  The Fox defendants objected to this instruction on the ground it would allow the Rosses to argue that the integration clauses in the LLC purchase agreements—in

---

[30]     The Fox defendants assert they objected to the fiduciary duty jury instruction in their brief in opposition to the Rosses' proposed instruction, but the opposition brief is not included in the record on appeal.  We therefore cannot tell what issues, if any, the Fox defendants raised as to the instruction.  (See *Mack v. All Counties Trustee Services, Inc.* (2018) 26 Cal.App.5th 935, 940 [""'[f]ailure to provide an adequate record on an issue requires that the issue be resolved against appellant'""]; *Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 996 [""'appellant bears the burden of providing an adequate record affirmatively proving error'""].)

which the Rosses represented they had not relied on any statements made by the Fox defendants outside of the agreements in purchasing their interests—were unenforceable. The trial court impliedly overruled the objection (by giving the instruction), and the Rosses' lawyer argued during his closing argument that "these representations in the context of a fraud case are meaningless." The trial court did not err in instructing the jury with Civil Code section 1668.

"It is well established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation." (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1500 [trial court erred in finding buyers could not rely on brokers' representations due to exculpatory clause in contract that provided that all understandings between the parties were incorporated into the agreement, because the clauses were unenforceable under section 1668]; accord, *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471 [holding as to waivers in private placement memoranda and other documents relating to investments by plaintiff that under section 1668, "a party may not contract away liability for fraudulent or intentional acts"].)

As the Fox defendants point out, the jury may consider a liability waiver in certain circumstances, including with respect to an "as is" provision in a purchase agreement that may be considered in determining a contracting party's justifiable reliance on representations made by a seller. (See *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 301 ["[T]he rule that this kind of contract provision does not, as a matter of law, preclude a finding of fraud does not mean the contract

provision is in every case irrelevant."]; *Driver v. Melone* (1970) 11 Cal.App.3d 746, 752 ["While the 'as is' provision does not relieve a seller of all responsibility of disclosure, it is a factor to be considered with all other circumstances in determining whether the buyer has been misled."].)

But contrary to the Fox defendants' contention, the Court of Appeal in *Hinesley* did not conclude that a waiver of liability for fraud is enforceable. As the court explained, "[Defendant] could not contractually insulate itself from its own fraud by this language, but such express language should have conveyed the implication [citation] that the lease did not come with a guarantee that any particular businesses would be or stay cotenants with Hinesley. The clause should have put Hinesley on notice to ask further questions. The clause is certainly a factor [citation] to consider in determining whether Hinesley justifiably relied on [defendant's representative's] representations regarding the particular tenants locating close to the suite Hinesley was considering leasing." (*Hinesley v. Oakshade Town Center, supra*, 135 Cal.App.4th at p. 302.)

Substantial evidence supported the trial court instructing the jury with Civil Code section 1668 based on the Rosses' evidence of fraud and the Fox defendants' introduction of the purchase agreements' integration clause. Under section 1668, the Fox defendants were not insulated from liability for their fraudulent representations, but the instruction did not prevent the Fox defendants from arguing the Rosses should not have been

68

misled by the representations because they were told all of the relevant representations were in the purchase agreements.[31]

e.     *Consequential damages*

The Rosses proposed a special jury instruction on consequential damages adapted from CACI No. 3243 (designed for actions under the Song-Beverly Consumer Warranty Act, Civil Code section 1790 et seq.).  The Fox defendants opposed use of the instruction and initially proposed CACI No. 1924 (Damages–"Benefit of the Bargain" Rule), but they later withdrew the instruction based on the Rosses' lawyer's representation that the Rosses had "withdrawn damage claims other than consequential damages."  At the first hearing on jury instructions, the trial court stated, "So we do need to deal with this one, because I was assuming that we were going to use [CACI No.] 1924, but . . . [CACI No.] 3243 is the lemon law instruction . . . ."  However, it appears the court failed to address the instruction further, stating at a subsequent hearing in response to the Rosses' request for a new consequential damages instruction, "the consequential damages are covered by CACI [No.] 1924."  At the hearing on the verdict form, in the context of how the verdict form should read, the Fox defendants' attorney noted, "I don't think we have a jury instruction with respect to

---

[31]     The Fox defendants also contend the instruction was erroneous because it effectively told the jury that the fact the Fox defendants included the integration clauses in the agreements was evidence of their intentional wrongdoing.  However, the Fox defendants forfeited this argument by failing to raise it below, and further, the Rosses did not argue to the jury that the waivers were evidence of wrongdoing.

consequential damages." However, the attorney did not request an instruction, and the court responded simply, "Okay." The court later instructed the jury without giving an instruction on consequential damages.[32]

In their motion for a new trial and on appeal, the Fox defendants contend the trial court erred in failing to give a consequential damages instruction, and this error resulted in the jury awarding excessive damages because the Rosses were only entitled to recover as consequential damages prejudgment interest on the money the Rosses invested accruing from the time the Rosses filed their complaint for rescission.[33]

The Fox defendants forfeited this argument by failing to propose their own damages instruction or raising the lack of an instruction at any time before the jury was discharged. (*Metcalf, supra*, 42 Cal.4th at pp. 1130-1131 [""""In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.""]; see § 647.) After the trial court instructed the jury, the Fox

---

[32] Although the trial court did not instruct on consequential damages, it instructed the jury on damages from multiple defendants (CACI No. 3933) and damages on multiple legal theories (CACI No. 3934). The court also instructed the jury as to rescission damages: "[I]f you determine that the plaintiffs have the right to rescind their investments with the defendants, the defendants must return to the plaintiffs everything of value they invested with the defendants, less all the money they received from the defendants."

[33] As discussed, regardless of whether the court should have instructed on consequential damages, prejudgment interest was not the proper measure of damages.

70

defendants' attorney failed to remind the court of the lack of a damages instruction, instead arguing in his closing argument the Rosses did not suffer any damages: "I would submit to you . . . there aren't any [damages], and you can't figure out any. And there aren't any because the only damage numbers that were put in were these manufactured numbers from plaintiffs' expert . . . . And if you ignore that, what are you going to do? Nobody testified there were monies stolen . . . . These were actually good investments." The Fox defendants' attorney may well have reasoned the absence of an instruction on consequential damages inured to the Fox defendants' benefit because a proper instruction would have supported Habibi's opinion the Rosses were entitled to damages to compensate them for the opportunity cost in investing with ACF. Regardless of the reason for their failure to request an instruction, by not doing so the Fox defendants forfeited any objection.

5. *The Fox defendants forfeited their challenge to the verdict form's failure to separate out the 13 syndications as to liability and damages*

The Fox defendants contend the verdict form was defective because it did not differentiate among the 13 syndications in which the Rosses invested, thus compelling the jury to award rescission on an "all-or-nothing" basis. The Fox defendants forfeited this contention by failing to timely raise it in the trial court and failing to propose a verdict form separating out the syndications.

The complaint did not contain separate causes of action for each syndication; instead, it alleged the Fox defendants "engaged in the same or similar conduct with respect to all of the

71

investments and properties." On January 19, 2018 the Fox defendants filed a proposed special verdict form that required the jury to make findings as to each element of each cause of action, but it did not distinguish among the syndications. Thus, like the final verdict form, the Fox defendants' proposed verdict form required the jury to make a single finding of liability and a single award of damages as to each cause of action and each plaintiff.

On June 26, 2018—at the conclusion of the presentation of evidence and the day before the trial court instructed the jury—the Fox defendants submitted a 28-page, 80-question amended proposed special verdict form. The proposed verdict form required the jury to calculate each plaintiff's "harm" as to each cause of action, but again the verdict form did not differentiate among the syndications. Further, a new section on rescission required the jury to award or deny rescission on an all-or-nothing basis as to each plaintiff. At the June 27, 2018 conference on the verdict form, with the jury waiting to be instructed, the Fox defendants objected for the first time to the verdict form prepared by the trial court on the ground that it did not separate out each syndication, and even then, the Fox defendants continued to advocate for use of their own form, which also did not separate out each syndication.

Under these circumstances, the Fox defendants forfeited any challenge to defects in the verdict form included in their own proposal. (See *Heppler v. J.M. Peters Co. (*1999) 73 Cal.App.4th 1265, 1287 ["because plaintiffs did not submit special verdict forms that addressed [defendant's] negligence; the issue is waived on appeal"]; Cal. Rules of Court, rule 3.1580 [party requesting special findings by jury must "present to the judge in writing the issues or questions of fact on which the findings are

72

requested"]; cf. *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 962 [no forfeiture where defendant "attempted repeatedly" to bring special verdict's failure to elicit findings on fraud to the attention of the trial court, including through motions filed prior to the punitive damages phase].) Moreover, even if there was no forfeiture, the trial court did not err in using a general verdict form based on the claims as pleaded.[34]

6. *The Fox defendants have not shown instructional error as to rescission or that the Rosses received a double recovery*

The Fox defendants contend they are entitled to a new trial because the verdict form, which included a finding as to each plaintiff that "[w]e award [plaintiff's name] the following amount of damages," was ambiguous and resulted in a double recovery because it led the jury to award the Rosses compensatory damages as well as restitution of their unreturned investment money that the trial court later awarded as the "[r]escissionary [a]mount" in its statement of decision This contention is forfeited and lacks merit.

---

[34] The Fox defendants rely on cases addressing a defendant's right to demur to a complaint that fails to separate out multiple transactions. (See *Ormerod v. Security-First National Bank of Los Angeles* (1937) 21 Cal.App.2d 362, 366-367; *Wilson v. Rigali & Veselich* (1934) 138 Cal.App. 760, 767; *Lee v. Folcey* (1930) 110 Cal.App. 607, 609-610.) The Fox defendants did not demur to the complaint on this basis, and they have not provided any authority to support their contention a verdict form must separate out the transactions included in a cause of action.

73

### a. *Relevant proceedings*

At the hearing on the verdict form, the Fox defendants' attorney asked the trial court to modify the language in the draft verdict form that referred to an award of "damages" to say, 'What, if any, consequential damages do you award?' The court did not modify the verdict form.[35]

In the course of its deliberations, the jury sent a note to the court with the following question: "If jurors choose rescission as 'Yes' and find more damages, do we add rescission to extra amount in amount of damages?" The trial court invited counsel to discuss the jury's question, indicating it thought the answer should be "no." The Rosses' attorney agreed, stating, "[R]escission is just something we have to do before we get the damages." The Fox defendants' attorney concurred, stating, "I think once they check the box 'yes' for rescission, then they need to make a decision about how much extra they're going to award the plaintiffs. And I think the answer is no to this question, because it would result in double recovery."[36] The Fox

_____

[35] The Fox defendants' June 26, 2018 amended proposed special verdict form also used the term "damages," not "consequential damages."

[36] The Fox defendants contend they did not forfeit their challenge based on their attorney's agreement to the response to the jury question because the attorney was an associate who did not have an opportunity to consult with lead trial counsel, who was not present in the courtroom. However, the associate's agreement to a "no" response was correct, and in any event, we do not find forfeiture based on the associate's agreement at the conference, but rather, based on the Fox defendants' failure to assert there was an ambiguity in the verdict form prior to the

74

defendants did not request to further instruct or question the jury, and they did not object that the verdict form was ambiguous.  Instead, the Fox defendants filed a posttrial brief on the implementation of the judgment in which they argued for the first time the jury included the Rosses' unreturned investment money, and therefore the trial court should not make an additional award for rescission of the Rosses' unreturned investment money.

> b. *The Fox defendants' forfeited their challenge, and there was no error*

The Fox defendants forfeited their challenge to the verdict form based on an asserted ambiguity in the damages question.  If the Fox defendants believed after the verdict was returned that based on an ambiguity in the verdict form the jury awarded the Rosses both compensatory damages and the return of their unreturned investment, they should have raised the issue before the jury was discharged.  (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1243 [challenge to jury's skipping questions on confusing verdict form forfeited where "appellant did not raise the defective verdict issue until after the jury had been discharged"]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [party "waived any objection to the special verdict form by failing to object before the court discharged the jury"]; see also § 619 ["When the verdict is announced, if it is informal or insufficient, in not covering the

discharge of the jury, by which time lead trial counsel had an ample opportunity to review the jury question and verdict form.

75

issue submitted, it may be corrected by the jury under the advice of the Court, or the jury may be again sent out."].)

Although "courts have declined to apply the waiver rule 'where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy""'" (*Saxena, supra*, 159 Cal.App.4th at pp. 327-328), the decision by the Fox defendants not to object to the verdict form before discharge of the jury appears to have been strategic. Because the jury awarded less than the lowest of three damage estimates provided by Habibi (based on the rate of return on the NAREIT apartment index), the Fox defendants stood to benefit by waiting until after the jury was discharged to challenge the court's award of rescission as duplicative, and when that failed, moving for new trial based on an asserted defect in the verdict.

Even if the issue were not forfeited, the Fox defendants have not met their burden to demonstrate the jury's award of approximately $4.3 million in damages erroneously included a rescissionary award. The jury's question, "If jurors choose rescission as 'Yes' and find more damages, do we add rescission to extra amount in amount of damages?" shows the jury understood the difference between "more damages" (that is, consequential damages) and rescission. The court's answer of "no" made clear the jury should not include the rescissionary amount in their damages award. Further, Habibi testified the return the Rosses would have received using the NAREIT apartment index was about $4.4 million and there remained approximately $1.1 million of unreturned investment money. Thus, it is a reasonable inference from the jury's award of about $4.3 million (and not $5.5 million) that the jury awarded only compensatory damages

76

based on the NAREIT apartment index return with a small discount. Although we do not know the basis for the discount, the jury could have accepted one of the Fox defendants' many arguments for why specific syndications were not fraudulent, or it may have excluded a return on two $125,000 interests Fox gifted to Zipkin and Eric in 2012.

On appeal, the Fox defendants also argue the fact the individual damage awards ($2,521,939 for Jerry, $925,708 for Eric, and $869,741 for Zipkin) equal exactly 91 percent of each plaintiff's initial investment shows the jury included recission. Although the Fox defendants' calculation of a 91 percent multiplier is mathematically correct, that fact does not support their argument the jury awarded a rescissionary amount. If the jury improperly included restitution in its award, that would mean its award of consequential damages was $3.2 million ($4.3 million less $1.1 million for return of the initial investments). The Fox defendants present no explanation for the basis on which the jury would have awarded $3.2 million in compensatory damages. That the jury awarded each of the Rosses damages in precise proportion to their individual initial investments suggests not that the jury also awarded rescission at an arbitrary 91 percent multiplier, but that the jury used the Rosses' initial investment amounts as a basis for allocating the total consequential damages, which Habibi's estimates did not do.

7.    *We reverse the jury's award of punitive damages against ACF; we affirm the award against Fox*

The Fox defendants contend the punitive damages award ($4 million each against Fox and ACF) was not supported by substantial evidence and was unconstitutionally excessive. We

77

agree the award against ACF was not supported by substantial evidence. However, there was substantial evidence Fox had a net worth exceeding $250 million and an ability to pay $4 million in punitive damages. Further, the award against Fox was not excessive.

a. *Applicable law and standard of review*

"'The purposes of punitive damages are to punish the defendant and deter the commission of similar acts. [Citations.] Three primary considerations govern the amount of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the injury suffered by the victims; and (3) the wealth of the defendant.'" (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 307; accord, *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 619-620; see *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 & fn. 13.) In reviewing an award of punitive damages, "the most important question is whether the amount of the punitive damages award will have deterrent effect—without being excessive . . . . [T]he award can be so disproportionate to the defendant's ability to pay that the award is *excessive for that reason alone*." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 111; accord, *Bigler-Engler*, at p. 307.) "'The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the defendant.'" (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1308 (*Pfeifer*); accord, *Rufo,* at pp. 621-622.)

The Supreme Court has not prescribed a single measure to assess a defendant's ability to pay punitive damages. (*Adams v. Murakami, supra*, 54 Cal.3d at p. 116, fn. 7.) "Net worth

78

generally is considered the best measure of a defendant's 'wealth' for purposes of assessing punitive damages." (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 391; accord, *Soto v. BorgWarner Morse TEC Inc*. (2015) 239 Cal.App.4th 165, 194 (*Soto*) ["[e]vidence of the defendant's net worth is the most commonly used" metric].)  However, because "net worth 'is subject to easy manipulation'" (*Pfeifer, supra*, 220 Cal.App.4th at p. 1308), courts have also considered "various asset and income figures relevant to the issue of punitive damages." (*Devlin*, at p. 391; accord, *Soto*, at pp. 194-195.)  By any measure, "'evidence of earnings or profit alone are not sufficient "without examining the liabilities side of the balance sheet." [Citations.]  . . .  Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income.'" (*Pfeifer*, at p. 1308; accord, *Soto*, at p. 194 ["Evidence of a defendant's income, standing alone, is not ""meaningful evidence."""].)  """Without evidence of the actual total financial status of the defendants, it is impossible to say that any specific award of punitive damage is appropriate.""" (*Soto*, at p. 194.)

"[T]he plaintiff has the burden of proving the defendant's financial condition, for purposes of an award of punitive damages." (*Pfeifer, supra*, 220 Cal.App.4th at p. 1307; accord, *Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638, 647 ["'[e]vidence of a defendant's financial condition is a legal precondition to the award of punitive damages'"]; accord, *Adams v. Murakami, supra*, 54 Cal.3d at p. 110.)  On review, we "examine the record to determine whether the challenged award rests upon substantial evidence.  [Citations.]  If it does not, and if the plaintiffs had a full and fair opportunity to make the

79

requisite showing, the proper remedy is to reverse the award." (*Soto, supra*, 239 Cal.App.4th at p. 195; accord, *Vanetik*, at pp. 647-648; see *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 535 ["Generally, punitive damages awards are reviewed under the substantial evidence standard of review 'in which all presumptions favor the trial court's findings and we view the record in the light most favorable to the judgment.'"].) "A reviewing court will reverse as excessive ""only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice."" (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 583, quoting *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 927.)

b.  *Evidence presented at the punitive damages trial*

At the punitive damages phase of the trial, the Rosses presented the jury with a document entitled "Alan C. Fox Summary of Equity and Pro-Forma Cash Flow as of December 13, 2016" (financial statement) to argue Fox had the ability to pay a punitive damages award as high as $25 million. The financial statement, which was signed by Fox and dated February 17, 2017, reported Fox had total equity (assets less liabilities) exceeding $250 million, and in December 2016 he received $125,000 in monthly income from ACF and $875,000 in monthly income from his properties' operations. The financial statement also included a detailed schedule of approximately 76 properties owned by Fox, identifying his ownership interest and loan obligations for each.

80

Fox was not present at the punitive damages trial, and the Fox defendants did not introduce evidence or address the financial statement in their closing argument.[37]  The Rosses did not present any additional evidence as to ACF.

> c.  *The punitive damages award against ACF is not supported by substantial evidence*

The Fox defendants contend substantial evidence does not support the punitive damages award against ACF because the Rosses did not introduce evidence of ACF's net worth or other sufficient evidence to show ACF's financial condition.  The Fox defendants are correct.  The Rosses did not introduce a financial statement for ACF or other evidence of the company's net worth or net income.  At trial, the Rosses' attorney told the jury it should instead base its award on ACF's ability to pay Fox $125,000 per month and its receipt of a management fee of 4 percent of gross rental income for approximately 70 shopping centers.  The Rosses' attorney suggested $3 million would be an appropriate punitive damages award, which was the equivalent of two years of salary paid to Fox.

Although evidence of net worth is not required to support an award of punitive damages, the Rosses still needed to produce some evidence of ACF's """actual total financial status.""" (*Soto, supra*, 239 Cal.App.4th at pp. 194-196 [evidence of corporation's income was not sufficient to support punitive damages award

---

[37]  Fox was in the state of Washington at the time of the punitive damages trial, despite notice that the trial would begin "as soon as the first phase was completed."  The Fox defendants' attorney noted Fox had been excused as a witness during phase 1 of the trial, and the Rosses had not requested his presence for phase 2.

because "this evidence was, at best, pertinent to only half of [defendant's] balance sheet and . . . did not shed any light on [its] liabilities or expenses"]; *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 681 [evidence of properties defendant owned and income was insufficient to show financial condition absent evidence of encumbrances and liabilities]; see *Pfeifer, supra*, 220 Cal.App.4th at p. 1308 ["'evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income'"].)

The fact that ACF paid Fox a monthly salary of $125,000 (as of December 2016) did not establish that ACF could or did pay Fox a $1.5 million salary every year. Further, although a 4 percent management fee for 70 shopping likely produces a significant income stream, the Rosses did not present evidence of the shopping centers' rental income on which the management fees were based. And the Rosses failed to present evidence of ACF's liabilities, expenses, or net worth (including what interest, if any, the company held in the shopping centers). Absent this information, we cannot infer ACF was able to pay $4 million without being "destroy[ed], annihilate[d], or cripple[d]" simply because it paid its CEO a hefty salary. (*Pfeifer, supra*, 220 Cal.App.4th at p. 1308.)

d. *Substantial evidence supports the punitive damages award against Fox*

On appeal, the Fox defendants contend there was no foundation to admit Fox's financial statement into evidence

because it was not authenticated.[38]  Because they asserted this objection below in an oral motion to exclude the evidence, we review the trial court's decision denying their motion for an abuse of discretion.  (*People v. Jones* (2013) 57 Cal.4th 899, 957 [applying abuse of discretion standard to admission of evidence].)  The trial court did not abuse its discretion.

Fox produced the financial statement pursuant to a court order compelling his compliance with the Rosses' punitive

---

[38]    The Fox defendants do not argue the financial statement presented an inaccurate statement of Fox's net worth as of December 31, 2016.  They likewise do not argue Fox lacked the ability to pay a $4 million punitive damages award.  Nor could they.  The $4 million award was less than 1.6 percent of Fox's claimed net worth as of December 31, 2016.  Appellate courts have affirmed awards that constituted a far greater share of a defendant's net worth.  (See, e.g., *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1540 [23 percent]; *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc., supra*, 155 Cal.App.3d at p. 391 [17.5 percent]; but see *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596 [28 percent was excessive]; *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515-516 [33 percent was excessive].)  The Fox defendants' argument the financial statement was too out-of-date to evidence Fox's ability to pay at the time of the trial in mid-2018 is not persuasive.  The financial statement was dated February 17, 2017, and the Fox defendants' attorney represented it was Fox's current financial statement when he produced it in early 2018.  Further, the financial statement showed Fox had few liabilities, and there is nothing to suggest Fox's financial position could have deteriorated between December 31, 2016 and mid-2018 to a degree relevant to his ability to pay a $4 million award.

damages discovery under Civil Code section 3295.[39]  On November 14, 2017 the trial court granted the Rosses' motion for leave to take punitive damages discovery from Fox.  After Fox failed to produce requested documents related to his financial condition in advance of his deposition, on January 12, 2018 the court ordered Fox to produce "[p]unitive damages discovery: [f]inancial statements" by January 18.  Fox's attorney acknowledged at the hearing on Fox's motion to exclude the financial statement that the document "was produced pursuant to [the] court's order."

The trial court at the hearing on ACF's motion to exclude found the financial statement was admissible, relying on three code provisions: Evidence Code section 1411 ("Except as provided by statute, the testimony of a subscribing witness is not required to authenticate a writing"); Evidence Code section 1414 ("A writing may be authenticated by evidence that:  [¶]  (a)  The party against whom it is offered has at any time admitted its authenticity"); and Evidence Code section 1421 ("A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing").

---

[39]  Civil Code section 3295, subdivision (c), provides in relevant part that "[n]o pretrial discovery by the plaintiff shall be permitted with respect to [evidence of the defendant's financial condition] unless the court enters an order permitting such discovery . . . ."  Subdivision (c) provides further the court may order discovery on a motion by the plaintiff after a hearing where "the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 [for punitive damages]."

We rejected a similar authentication argument made by the defendant in a punitive damages trial in *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 241-244 (*StreetScenes*). There, the defendant ITC argued there was insufficient evidence to support an award of punitive damages because it had objected on foundation, authentication, and hearsay grounds to the admission of a two-page unsigned financial report it had produced pursuant to a court order under Civil Code section 3295. We concluded the document was admissible, explaining, "ITC presented the information to the court after being ordered to do so and after informing the court it would present the information at the proper time. The documents were from ITC and were presented to the court by ITC's counsel as per the statement of two days before. This is all the authentication that is required. (Evid. Code, §§1414, 1420, 1421.)" (*StreetScenes*, at p. 244.)

As in *StreetScenes*, the trial court here expressly ordered Fox to produce "[f]inancial statements" after the court previously granted the Rosses' motion to take discovery of Fox's financial condition under Civil Code section 3295. The fact the attorney in *StreetScenes, supra*, 103 Cal.App.4th at page 244 produced the financial documents directly to the trial court is a distinction without a difference. Further, by acknowledging the financial statement responded to the court's order, the Fox defendants admitted to the document's authenticity. (Evid. Code, §1414, subd. (b).) This case is even stronger than *StreetScenes* because Fox signed and dated the financial document, whereas in *StreetScenes* the produced document was not signed or dated. Moreover, it is unlikely anyone other than Fox would have information on Fox's assets, liabilities, and property holdings.

(Evid. Code, §1421.)  The financial statement was therefore admissible and provided substantial evidence of Fox's ability to pay the punitive damages award.

e.  *The punitive damages award against Fox is not unconstitutionally excessive*

The Fox defendants contend the combined $8 million punitive damages award against them is unconstitutionally excessive because the ratio of the punitive damages award to the $4.3 million compensatory damages award exceeded one to one. (See *State Farm Mutual Automobile Insurance Co. v. Campbell* (2003) 538 U.S. 408, 425 (*State Farm*) ["When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."]; *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 719 (*Roby*).)  We review de novo whether an award of punitive damages is excessive under the due process clause of the federal Constitution.  (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172; *Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455, 463.)

Although the Fox defendants argue the $8 million punitive damages award was excessive, the jury separately awarded $4 million in punitive damages against Fox and $4 million against ACF.  Because we are reversing the punitive damages award against ACF, we therefore consider whether the $4 million punitive damages award against Fox violates due process.  It does not.  The Fox defendants have not cited to any authority for the proposition an award of punitive damages in an amount less than compensatory damages is excessive under *State Farm*, and we are not aware of any.  Moreover, the Supreme Court in *Roby,*

86

*supra*, 47 Cal.4th at page 719, explained a "one-to-one ratio between compensatory and punitive damages is the federal constitutional limit" in a case where there is a "relatively low degree of reprehensibility" on the part of the defendant and a substantial compensatory damages verdict.[40] Fox's level of reprehensibility was far from low.

In evaluating the reprehensibility of a defendants' conduct, we consider "whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" (*Roby, supra*, 47 Cal.4th at pp. 717-718 [reducing punitive damages award against defendant employer to one-to-one ratio in discrimination action because the employer's conduct—as compared to the direct

---

[40] As the California Supreme Court explained in *Roby*, the U.S. Supreme Court set "'three guideposts' for courts reviewing punitive damages awards: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" (*Roby, supra*, 47 Cal.4th at p. 712, quoting *State Farm, supra,* 538 U.S. at p. 418; accord, *Mazik v. Geico General Ins. Co., supra*, 35 Cal.App.5th at p. 471.) ""Of the three guideposts . . . the most important is the degree of reprehensibility of the defendant's conduct."" (*Roby*, at p. 712, quoting *State Farm*, at p. 419.) The Fox defendants focus on the ratio of punitive to compensatory damages and the level of reprehensibility.

87

supervisor's misconduct—was "at the low end of the range of wrongdoing"].) Here, there was ample evidence Fox engaged in a decades-long scheme to intentionally defraud multiple investors. And, although the Rosses were not physically injured or impoverished, Jerry entrusted Fox in 2004 with "most of my kids' inheritance, with some left over for some charities." Fox solicited Jerry's investments for over a decade and marked up the purchase price for the majority of the shopping centers in which Jerry invested by more than a million dollars, showing a reckless disregard for the Rosses' wellbeing and an abuse of Jerry's vulnerability based on his age. (See *Roby*, at p. 716 ["an act rooted in 'intentional malice'" is more reprehensible than a mere "failure to prevent the foreseeable discriminatory consequences flowing from [an] otherwise appropriate [corporate] policy"]; see also *Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists* (9th Cir. 2005) 422 F.3d 949, 958-959 ["'infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty'"], quoting *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 576.)[41]

---

[41] The Fox defendants also contend the consequential damages were unconstitutionally excessive because prejudgment interest is the proper measure of rescission damages, and the Rosses should have recovered their out-of-pocket expenses instead of their lost investment income. As discussed, these arguments lack merit.

88

8. *The trial court's award of postverdict prejudgment interest was proper*

The Fox defendants contend the trial court erred in awarding the Rosses prejudgment interest on the consequential damages award for the period from the verdict (July 2, 2018) to the date of entry of judgment (April 26, 2019), arguing that postverdict prejudgment interest is barred by statute and that the Rosses' damages were uncertain. These contentions lack merit.

Civil Code section 3287, subdivision (a), provides in relevant part, "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ." "'"The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.' [Citations.]" [Citation.] Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (*Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 774; see *Olson v. Cory* (1983) 35 Cal.3d 390, 402 ["Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability."].) "Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535; accord, *State of California v.*

*Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038.) "'"On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was known or available to the defendant at the time"'" (*State of California, supra*, 15 Cal.App.5th at p. 1038; accord, *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151.)

The Fox defendants argue an award of postverdict prejudgment interest is barred by section 685.020,which provides in subdivision (a) that "interest commences to accrue on a money judgment on the date of entry of the judgment." But section 685.020 only applies to postjudgment interest. The Fox defendants' reliance on *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 532-533 is misplaced. There, the Court of Appeal concluded as to postjudgment interest that section 685.020 provided for interest to accrue from the date of judgment, not the jury's verdict. (*Pelligrini*, at pp. 532-533.) The court declined to extend to an award of postjudgment interest the provision in California Rules of Court, former rule 3.1802 requiring the clerk "'include in the judgment . . . the interest accrued since the entry of the verdict.'" (*Pelligrini*, at p. 532.) The *Pelligrini* court reasoned California Rules of Court, former rule 3.1802, applied only to prejudgment interest, and it could not control over the statutory provision in Code of Civil Procedure section 685.020 applicable to postjudgment interest. (*Pelligrini*, at p. 533.)

As the Court of Appeal in *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 935 explained, California Rules of Court, former rule 3.1802 was not inconsistent with Code of Civil Procedure section 685.020 because Civil Code section 3287 authorized prejudgment interest in cases where damages were

vested and certain. And significantly, California Rules of Court, rule 3.1802 now provides simply that "[t]he clerk must include in the judgment any interest awarded by the court." As the Judicial Council's Civil and Small Claims Advisory Committee reported to the Judicial Council in connection with the modification of rule 3.1802 to remove the reference to the clerk calculating prejudgment interest, "[e]liminating the language from the rule of court would not preclude a court from awarding prejudgment, post-verdict interest in appropriate cases. . . . [¶] . . . [¶] [T]he recommended amendment does not affect who can receive interest or in what circumstances, but only clarifies that a clerk is not to automatically add interest to a judgment as a ministerial act." (Judicial Council of Cal., Advisory Com. Rep., Civil Procedure: Clerk's Addition of Interest to Judgments (2013) p. 4.) Thus, read in conjunction with Civil Code section 3287, subdivision (a), the trial court appropriately determines the amount of prejudgment interest, if any (including postverdict interest), and under California Rules of Court, rule 3.1802, the clerk enters the amount of interest in the judgment. The clerk likewise would enter postjudgment interest under Code of Civil Procedure section 685.020. There is nothing inconsistent about this scheme.

The Fox defendants also argue the amount of the Rosses' damages was uncertain at the time of the verdict because the "jury awarded an unspecified form of damages, having never been instructed how to calculate consequential damages." They contend the jury award included a rescission component (and the trial court subsequently ordered duplicative rescission) such that the consequential portion was uncertain. But, as discussed, it is clear the jury's damages award constituted consequential

91

damages and not the rescissionary amount. Habibi testified the Rosses were entitled to "get[] back their capital, plus a reasonable return" for the time their money was tied up in the Fox investments, and he opined $4.4 million was the lowest measure of consequential damages based on the NAREIT apartment index. In the course of its deliberations, the jury sent a note to the court asking, "If jurors choose rescission as 'Yes' and find more damages, do we add rescission to extra amount in amount of damages?" The court, with the agreement of the parties' attorneys, responded "no." The jury then awarded $4.3 million in damages, just shy of Habibi's estimate of consequential damages. This amount has no reasonable connection to the rescissionary amount, which the Fox defendants do not dispute was approximately $1.1 million. Had the jury intended to award rescission and consequential damages, the award would likely have been higher than Habibi's lowest estimate.

The amount of compensatory damages was therefore known to the Fox defendants at the time the jury returned the verdict, satisfying the certainty requirement of Civil Code section 3287. (*State of California v. Continental Ins. Co., supra*, 15 Cal.App.5th at p. 1038; see *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293 ["prejudgment interest compensates for the loss of the use of the money during the period between the assertion of the claim and the rendition of judgment"].)[42]

---

[42] The Fox defendants further argue that the Rosses' attorney waived prejudgment interest when he told the trial court during the conference on jury instructions, "We'll seek interest on the judgment . . . but not on the consequential damages." This

92

## DISPOSITION

We reverse the trial court's order granting a new trial and affirm the court's order denying the Rosses' motion for judgment notwithstanding the verdict.  We also reverse the punitive damages award against ACF.  We otherwise affirm.  We remand to the trial court with instructions to enter judgment in favor of the Rosses, but to strike the punitive damages award against ACF.  The parties are to bear their own costs.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

argument distorts the record.  The Rosses' attorney made this statement during discussion of the Fox defendants' proposed special jury instruction 13, which sought to instruct the jury that interest on money paid under a contract later rescinded —which the Fox defendants argued was the proper measure of consequential damages—began accruing no earlier than the 2017 filing of the amended complaint with a demand for rescission.   It is clear in context that the Rosses' attorney was arguing that the Rosses were not seeking as consequential damages an award of prejudgment interest, so the jury should not be instructed on prejudgment interest.